**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

·v.

**DISTRICT 30, UNITED MINE WORKERS OF AMERICA, and Local 8280, United Mine Workers of America, Respondents.**

**No. 18742.**

United States Court of Appeals Sixth Circuit.

Dec. 29, 1969.

Glen M. Bendixsen, Atty., National Labor Relations Board, Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph C. Thackery, Atty., National Labor Relations Board, Washington, D. C., on brief.

Grant F. Knuckles, Pineville, Ky., and H. B. Noble, Hazard, Ky., for respondents, Edward L. Carey, Harrison Combs, Willard P. Owens, Washington, D. C., on brief.

Before O'SULLIVAN, PECK, and Mc-CREE, Circuit Judges.

McCREE, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order requiring respondents, a district organization (District 30) and a local organization (Local 8280) of the United Mine Workers of

America, to cease and desist from certain unfair labor practices and to post appropriate notices. The Board's Decision and Order are reported at 166 NLRB No. 8 (1967).

On January 17, 1964, the United Mine Workers (hereinafter UMW) was certified as the collective bargaining representative of the production and maintenance employees at Blue Diamond Coal Company's Leatherwood No. 1 mine located near Leatherwood, Kentucky.[1] Thereafter, on February 24, 1964, Blue Diamond served on respondents a 60 day notice of termination of the existing contract,[2] and negotiations for a new contract commenced. The parties bargained to an impasse on economic issues and, when the existing contract expired on April 27, 1964, all the employees ceased working at the mine.

On August 11, 1964, Blue Diamond notified the striking employees by letter that those employees who had not returned to work by August 24 would be permanently replaced. Shortly after receiving this letter, approximately 200 employees appeared at the company's premises. The local president and three committeemen emerged from the group and informed the mine superintendent that they wanted to discuss their jobs and the possibility of returning to work. The superintendent, acting on the instructions of the company's vice-president, replied that he would "talk to them as individuals, but not as a group." After reporting this response to the employees, the union representatives advised the superintendent that this was unacceptable, and the employees departed.

Blue Diamond resumed mining operations in November, 1964 with a work force of approximately 120 men, about 28 of whom were former employees who had been rehired. On January 19, 1965, the UMW responded by instituting a picket line at the mine. The picketing continued, with one interruption, until it was enjoined in a section 10(l) proceeding on July 13, 1963.[3]

At about the same time the UMW began picketing the mine, the Southern Labor Union (hereinafter SLU) requested recognition as the collective bargaining representative of the employees hired by the company to reopen the mine. The company declined on the ground that the SLU did not represent a majority of these employees. However, the SLU contin-

1. The United Mine Workers had been the recognized representative of Blue Diamond's employees since about 1945 and had entered into a series of open-end contracts with the company. A petition for an election was filed in November, 1962, and an election was conducted in September, 1963. The UMW won the election by a vote of 338–0, and subsequently was certified as the employees' bargaining representative by the Regional Director.

2. This contract had been executed prior to certification of the UMW. See n. 1, supra.

3. Section 10(l), 29 U.S.C. § 160(l), provides, in pertinent part:
   Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of * * * section 158(b) (7) [unlawful recognitional picketing by a labor organization] of this title, the preliminary investigation of such charge shall be made forthwith * * *. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, * * * for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief * * * as it deems just and proper, notwithstanding any other provision of law * * *.
   Charges against the UMW, alleging a violation of section 8(b) (7) (A) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b) (7) (A), had been filed on December 7, 1965. Although the UMW appealed the grant of the Section 10(l) injunction to this court, the appeal was mooted by the Board's order requiring respondents to cease and desist from the picketing and it was therefore dismissed.

ued its organizational efforts and, on April 30, 1965, presented 120 signed authorization cards to officers of the company and again requested recognition. After its office manager had authenticated the validity of the signatures on 115 of the cards, Blue Diamond advised the SLU that it would accede to the request for recognition.[4] Five days later, the company and the SLU signed a collective bargaining agreement.

After representing the employees at Leatherwood No. 1 for about seven months, during which time the picketing by the UMW continued unabated, the SLU filed unfair labor practice charges with the Board alleging that the UMW was engaging in recognitional picketing in violation of section 8(b) (7) (A) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b) (7) (A). A complaint was issued and in August, 1966, a hearing was conducted by a Trial Examiner.

Section 8(b) (7) (A) provides:

It shall be an unfair labor practice for a labor organization or its agent—

\*    \*    \*    \*    \*    \*

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where *an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization* as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, *unless such labor organization is currently certified as the representative of such employees*:

(A) where the employer has *lawfully recognized* in accordance with this Act any other labor organization and a

question concerning representation may not appropriately be raised under Section 9(c) of this Act (italics added by Trial Examiner).

The Trial Examiner, relying on the italicized portions of the statue, held that the General Counsel had failed to establish a violation and dismissed the complaint. He found that the object of the picketing was not to compel Blue Diamond to recognize or bargain with the UMW, but to protest the company's unfair labor practice committed in August, 1964, when it insisted on individual bargaining with the employees. Accordingly, he concluded that the picketing was not for the purpose proscribed by section 8(b) (7) (A). The Trial Examiner also found that during the period of picketing, the UMW retained its status as the currently certified representative of Blue Diamond's employees, and that for this reason, too, its picketing was not within the proscription of section 8(b) (7) (A). Finally, the Trial Examiner concluded that Blue Diamond's recognition of the SLU was necessarily invalid since it occurred while the UMW was still the certified representative of the company's employees and the SLU was a minority union.[5]

The critical finding in the Trial Examiner's decision was his determination that the company committed an unfair labor practice when it refused to bargain with the employees' chosen representatives and insisted on separate negotiations with each employee. It was this unfair labor practice which converted what began as an economic strike into an unfair labor practice strike and enabled the Trial Examiner to find that the purpose of the picketing was to protest the unfair labor practice. Also, it was this unfair labor practice which created a right to rein-

---

4. On the same day that the company recognized the SLU, its vice-president wrote a letter to the president of the District 30 organization informing him:

    You are hereby notified that Blue Diamond Coal Co. is convinced that United Mine Workers of America no longer represents a majority of our employees

at our Leatherwood Mine, Leatherwood, Perry Co., Ky.

5. The Trial Examiner also questioned the legitimacy of the company's recognition of the SLU on the ground that the validity of the signatures on the authorization cards had not been properly established.

statement on the part of the striking employees, and in turn, permitted the findings by the Trial Examiner that, during the picketing, the UMW was the certified representative of Blue Diamond's employees and that recognition of the SLU was invalid. He reasoned that since unfair labor practice strikers are entitled to reinstatement, the striking employees had to be included in the bargaining unit for the purpose of determining the number of employees from whom the SLU had to obtain authorization cards in order to achieve majority status [6] and to rebut the presumption of majority status enjoyed by the UMW because of its earlier certification.[7] If the unfair labor practice strikers were included in the unit, it is apparent that the SLU had not obtained enough authorization cards to achieve majority status, since the number of unfair labor practice strikers exceeded the combined number of returned strikers and striker replacements.[8] Thus, the Trial Examiner concluded that the presumption of majority status enjoyed by the UMW had not been rebutted, and the UMW retained its representative status during the picketing.

At the hearing, the General Counsel contended that despite the undisputed evidence of the company's refusal to negotiate with the employees' representatives, the Trial Examiner was precluded from attaching any significance to this putative unfair labor practice because the UMW had failed to file a meritorious charge challenging the company's conduct within the six month period of limitations prescribed in section 10(b) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(b). The Trial Examiner disagreed and held that the failure to file a meritorious charge did not preclude the introduction of *evidence* of the company's unfair labor practice and the union's reliance on this conduct as a *defense* to the alleged violation of section 8(b) (7) (A).

The Board, relying on its decision in *Roman Stone Construction Co.*,[9] reversed the Trial Examiner and held that it was "improper to pass upon the Employer's conduct which occurred more than 6 months prior to the filing of the charges" by the SLU. In *Roman Stone*, the Board held that when the filing of a charge contesting the validity of a company's recognition of a union is barred by the six month period of limitations of section 10(b), another union cannot invoke the claimed invalidity as a defense to an alleged violation of section 8(b) (7) (A). The Board concluded that to hold otherwise would enable the union which asserted the stale claim in defense of its picketing to circumvent the limitations requirement and to defeat the stability in bargaining relationships which that provision was designed to further. It would permit the union to accomplish by means of picketing something it could no longer

6. *See* Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L. Ed. 309 (1956). If the striking employees had remained economic strikers, they would not have been included in the bargaining unit as of April 30, 1965 (the date of recognition of the SLU), since by that date the strike would have been in progress for more than twelve months. *See* Section 9(c) (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 159(c) (3).

7. Under the Board's rules, a union's majority status is irrebuttably presumed for a period of one year following certification as the employees' bargaining representative. After the first year, the presumption remains, but it is rebuttable. Celanese Corp. of America, 95 NLRB 664, 671–672 (1951). *See* N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir. 1966); N.L.R.B. v. Richard W. Kaase Baking Co., 346 F.2d 24, 30–32 (6th Cir. 1965).

8. About 180 employees went on strike in April, 1964. If the 28 employees who returned to work in November, 1964 are subtracted from this number, it still exceeds the total of 120 employees who were used to reopen the mine and subsequently were organized by the SLU.

9. International Hod Carriers' Building & Common Laborers' Union of America, Road & Heavy Construction, Local 1298, and Roman Stone Construction Co., etc., 153 NLRB 659 (1965).

accomplish under established Board procedures.

■■ Based on its holding in *Roman Stone*, the Board determined that the UMW could not employ Blue Diamond's alleged unfair labor practice as a shield when section 10(b) barred its use as a sword. This determination insulated from attack and thereby validated the company's recognition of the SLU.[10] Under the Board's contract-bar rules, the contract signed shortly after this "lawful" recognition precluded other labor organizations, including the UMW, from raising a question concerning representation during the period of this contract. *See* N. L. R. B. v. Local 3, International Brotherhood of Electrical Workers, 362 F.2d 232, 236 (2d Cir. 1966). Moreover, since the UMW was barred from availing itself of the effect of Blue Diamond's conduct in August, 1964, its picketing could not be regarded as protesting an unfair labor practice and therefore could be regarded only as an effort to compel the company to recognize and bargain with the UMW. Accordingly, the Board concluded that after May 5, 1965 (the date the collective bargaining agreement was signed), the picketing by the UMW violated section 8(b) (7) (A), since it was an attempt to compel the company to recognize and bargain with the UMW at a time when a question concerning representation could not be raised under section 9(c).[11]

■■ In opposing the Board's petition for enforcement, respondents contend that the Trial Examiner correctly concluded that the failure to file timely charges challenging Blue Diamond's refusal to bargain or its recognition of the SLU affect only the availability of a remedy for these unfair practices. The limitations bar does not require the Board to ignore the practices to the extent they may be relevant as evidence in the section 8(b) (7) (A) proceeding initiated by the SLU. In other words, respondents contend that section 10(b) is a statute of limitations, and not a rule of evidence.

This same contention was presented to the Supreme Court in Local Lodge No. 1424, International Assoc. of Machinists, AFL–CIO, et al. (Bryan Mfg. Co.) v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). In *Bryan Mfg.* the union and the company had committed a putative unfair labor practice by signing a collective bargaining agreement which contained a union security clause at a time when the union did not represent a majority of the company's employees. More than six months after the execution of this agreement a complaint was filed against the union and the company. They defended the action on the ground that it was barred by the limitations proviso of section 10(b). The Board rejected the defense and held that the union and the company had committed an independent unfair labor practice by their continued

---

10. Once it was decided the strikers could not invoke the company's putative unfair labor practice as a defense, this necessarily meant they remained economic strikers throughout the period of the strike. As economic strikers, they were no longer a part of the bargaining unit on April 30, 1965 (the date of recognition of the SLU). *See* n. 6, *supra.* Accordingly, the SLU had obtained authorization cards from a majority of the employees *in the bargaining unit* as of April 30, 1965, and, on the basis of the authorization cards, it became the lawfully recognized bargaining agent of *those* employees. *See* N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed. 2d 547 (1969).

11. It should be noted that Section 8(b) (7) (A) does not protect only bargaining relationships established as a result of an election and subsequent certification of a union. It also "affords protection to lawfully recognized unions which do not have certified status," International Hod Carriers' Building and Common Laborers' Union of America, Local 840, and Blinne Construction Co., 135 NLRB 1153, 1156 n. 5 (1962), and therefore would be applicable to a bargaining relationship entered into on the basis of authorization cards. *See* N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

*enforcement* of the agreement (which occurred within the six-month period preceding the filing of the complaint). Furthermore, the Board held that although a complaint based on the *execution* of the agreement was time-barred, evidence related to the execution of the agreement was "relevant in determining whether [the] conduct within the 6-month period was unlawful" and therefore was admissible.

The Supreme Court reversed the Board and, after discussing the nature of the issue presented, established a test for determining the admissibility of evidence related to events which occur more than six months prior to the filing of a complaint.

It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect

results in reviving a legally defunct unfair labor practice.

The situation before us is of this latter variety, for the entire foundation of the unfair labor practice charged was the Union's time-barred lack of majority status when the original collective bargaining agreement was signed. In the absence of that fact enforcement of this otherwise valid union security clause was wholly benign.

\* \* \* \* \* \*

Where, as here, a collective bargaining agreement and its enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, we think that permitting resort to the principle that § 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section. These policies are to bar litigation over past events "after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused, \* \* \*" and of course to stabilize existing bargaining relationships. 362 U.S. at 416–419, 80 S.Ct. at 826–828.

*Accord*, N. L. R. B. v. Lawrence Typographical Union, 376 F.2d 643, 650 (10th Cir. 1967); American Federation of Grain Millers v. N. L. R. B., 197 F.2d 451, 453 n. 56 (5th Cir. 1952). But *see* N. L. R. B. v. American Aggregate Co., 305 F.2d 559, 563 (5th Cir. 1962).

Respondents attempt to avoid the holding in *Bryan Mfg.* by pointing out that it was not the UMW which filed the complaint and sought to revive legally defunct unfair labor practices. Moreover, they contend that the UMW merely sought to "shed light on the true character of matters occurring within the limitations period" by introducing evidence

related to events which transpired prior to that period and that this is permissible under the dichotomous test enunciated in *Bryan Mfg.*

Both of these contentions are without merit. The Supreme Court announced a rule in *Bryan Mfg.* which prevents the resurrection of legally defunct unfair labor practices in the guise of evidence and the resultant subversion of the policies promoted by the limitations proviso of section 10(b). To permit respondents to invoke the company's putative unfair labor practices in this case as a defense to the unlawful picketing charge would be directly contrary to this rule.

During the six-month period preceding the filing of the charges which spawned the present litigation, the SLU was, in the absence of any reference to .events which occurred prior to the six-month period, the lawfully recognized representative of the employees at Blue Diamond's Leatherwood No. 1 mine. Moreover, the SLU had signed a three year contract, which was valid on its face, approximately seven months before it filed charges and therefore, under the Board's contract-bar rules, its representative status was not then subject to challenge under Section 9 of the NLRA. Accordingly, the picketing by the members of the UMW was, "on the face of things," illegal under section 8(b) (7) (A); and only by establishing the existence of earlier, time-barred unfair labor practices could the UMW infuse with legality this otherwise illegal conduct.

Thus, respondents seek to do more than merely clarify the nature of events which transpired within the limitations period. They seek to litigate the legality of conduct engaged in by Blue Diamond prior to the limitations period and, if successful, to invoke this conduct as a defense to the unlawful picketing charge. It is precisely this type of circumvention of the policies underlying section 10(b) which the Supreme Court condemned in *Bryan Mfg.*

██ If the conduct engaged in by Blue Diamond more than six months be-

fore the filing of the charges is disregarded, there is substantial evidence in the record considered as a whole to support the Board's finding that the picketing constituted a violation of section 8(b) (7) (A). Furthermore, we also find substantial evidence in the record as a whole to support the Board's finding that respondents were jointly responsible for this illegal conduct. Cf. United Mine Workers of America v. Patton, 211 F.2d 742, 746 (4th Cir. 1954).

Accordingly, the Board's petition for enforcement of its order against respondents is granted.