**INGRESS–PLASTENE, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17739.**

United States Court of Appeals, Seventh Circuit.

June 10, 1970.

As Amended July 7, 1970.

Rehearing Denied Aug. 31, 1970.

---

(5) of the National Labor Relations Act and ordering it to cease and desist from the unfair labor practices, to bargain with the union,[1] and to post appropriate notices.

The order was based on findings by the trial examiner and the Board that the company violated section 8(a) (1) by engaging in coercive interrogation of employees, soliciting and assisting employees to withdraw their union dues checkoff authorizations, impressing upon their employees the futility of continued union membership, creating the impression of surveillance of union activities, threatening never to enter into a contract with the union, initiating beneficial changes in wages and working conditions, and otherwise disparaging the union by unilateral action. The section 8 (a) (5) violation was based on the finding that the company unilaterally changed wages and other terms and conditions of employment and the withdrawal of recognition of the union as collective bargaining agent for the employees.

On September 30, 1966, after an election, the Board certified the union as exclusive collective bargaining representative of the employees in the relevant unit. On April 24, 1967 the parties executed a collective bargaining agreement effective from that date through November 30, 1967. The contract provided for automatic renewal unless either party served notice to terminate or modify sixty days prior to the date of expiration. Timely notice of modification was sent by the union to the company on September 13, 1967, and on September 21 the company agreed to meet to negotiate a new agreement.

The alleged commission of 8(a) (1) violations began on September 27, 1967 and ran through the beginning of December. On October 18 the company wrote to the union stating that it believed that the latter no longer represented a majority of the unit employees and, therefore, refused to recognize the union for bargaining purposes. Two days later the

R. Theodore Clark, Jr., Chicago, Ill., Frank H. Stewart, Charles D. Lindberg, Alan E. Harazin, Taft, Stettinius & Hollister, Cincinnati, Ohio, for petitioner.

Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Julius Rosenbaum, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Attys., N. L. R. B., for respondent.

SWYGERT, Chief Judge, and CASTLE, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

SWYGERT, Chief Judge.

Ingress-Plastene Inc. petitions this court to review and set aside an order of the National Labor Relations Board finding the company guilty of various violations of sections 8(a) (1) and 8(a)

1. International Union, Allied Industrial Workers of America, Local 480.

company petitioned the Board for a new election, which petition was dismissed by the regional director on October 30 on the ground that the original contract was still in effect. The company never appealed this dismissal to the Board. On October 31 the union again requested to bargain over a new agreement. The company, on the next day, again declined to recognize the union.

After reviewing the record, we hold that the Board's findings of unlawful interrogations, solicitations, and impression of the futility of continued union membership are supported by substantial evidence. The findings were based on testimony which revealed that some of the high ranking supervisors interrogated a number of employees about their union membership and encouraged them to revoke their membership.[2] Upon achieving success with some of the employees, the assistant to the company's personnel director assisted the employees in revoking their dues checkoff authorizations by suggesting the language to be used in the revocation.[3] Such conduct constitutes a violation of section 8(a)(1). NLRB v. Moore's Seafood Products, Inc., 369 F.2d 488, 489 (7th Cir. 1966).

Moreover, numerous statements were made to employees informing them that the company would never bargain with the union and that benefits would be given by the company even without the union. These statements also violated section 8(a)(1), Wigwam Mills, Inc., 149 N.L.R.B. 1601, 1612, 1614 (1964), enforced, 351 F.2d 591, 592 (7th Cir. 1965), and were contrary to the company's avowed desire to have an election to determine the status of the union. Although there are conflicts in the testimony of the various witnesses, we find no compelling reason to overrule the trial examiner's determinations of credibility. See Sarkes Tarzian, Inc. v. NLRB, 374 F.2d 734, 736 (7th Cir.), cert. denied, 389 U.S. 839, 88 S.Ct. 64, 19 L.Ed.2d 102 (1967). Following these determinations, we grant enforcement to that part of the Board's order finding violations in the areas mentioned above.

We deny enforcement, however, to that part of the order finding an 8(a)(1) violation in the company's alleged creation of the impression of surveillance of union activities. The incident in question occurred some time after November 29, 1967 when an employee overheard a conversation between two foremen wherein one of the foremen stated that the union was not very strong since there were only six or seven cars around the building where a union meeting was being held. We cannot find evidence in the record which establishes the coercive effect required to support a finding of impression of surveillance. The testimony does not reveal that the company intended to create an impression that it was keeping the employees' union activities under surveillance or that the employees believed their actions to be under company surveillance. See NLRB v. Ralph Printing and Lithographing Company, 379 F.2d 687, 691 (8th Cir. 1967). The only "surveillance" reported—a foreman passing a building where a union meeting was being held while driving on the main street of the small town in which the

---

2. Of these incidents, only two occurred prior to October 17, when the company withdrew recognition. The first occurred on September 27 when general foreman Gill solicited employee Miles' revocation of her dues checkoff authorization, which revocation was completed on October 12. Gill also pressured another employee, Beck, to withdraw her checkoff authorization. Although the exact dates on which Gill approached Beck were not specified in the record, it was disclosed that Gill made a number of inquiries some time before October 27, when Beck finally revoked her checkoff authorization.

3. The company contends that the Board could not find this conduct to be unlawful since the assistant was not alleged to be a supervisor. This is irrelevant so long as she gave the appearance of acting on behalf of management. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940).

company is located—cannot lead to the conclusion reached by the Board. *See Montgomery Ward & Company v. NLRB,* 385 F.2d 760, 763 (8th Cir. 1967).

Since the validity of the other 8(a) (1) violations depends upon our holding on the 8(a) (5) charge, we shall defer dealing with them until the latter part of the opinion.

■ The majority status of a union is conclusively presumed to continue for one year after the union is certified, absent special circumstances. In refusing to bargain with a certified union after the one-year period, as in the instant case, an employer violates section 8(a) (5) unless he can rebut the presumption of continued majority support by establishing either that the union has in fact lost its majority, or that the company, in good faith, has reasonable grounds to believe that the union has lost the support of a majority of the union employees. *Brooks v. NLRB,* 348 U.S. 96, 103–104, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Terrell Machine Co. v. NLRB,* 427 F.2d 1088 (4th Cir., No. 13,371, January 20, 1970); *Lodges 1746 and 743, I. A. M. & Aerospace Workers, AFL–CIO v. NLRB,* 135 U.S.App.D.C. 53, 416 F.2d 809, 812 (1969). Ingress-Plastene contends that it met its burden under either test. We hold that the company demonstrated that its refusal to bargain was predicated on a reasonably grounded good faith doubt of the union's majority and accordingly deny enforcement of the bargaining order and findings of an 8(a) (5) violation.

■ The sequence of events leading to the refusal to bargain and withdrawal of recognition began on October 17, 1967 when employee Sheets, the president of the union, came to personnel director Ferguson's office, at the latter's request, to pick up a seniority list. Ferguson asked Sheets whether he had additional checkoff authorizations, and Sheets replied that he had two more in his car. This totaled 49 employees out of 156 in the unit. Ferguson then asked whether this was "all the people that you represent" and Sheets replied affirmatively.[4]

The next day, October 18, Ferguson met with board chairman Cramer and company president Waldon to confer on the company's position toward the union. The three executives concluded that the union no longer represented a majority of the employees on the basis of a number of factors. First was Sheets' admission made the day before. Also heavily relied upon was an October 2 letter from the union to the employees which urgently solicited membership to make the union "100% strong" because the "more members that [the Union] has, the more strength the union has to bargain with."[5] Among the other factors relied upon to demonstrate the lack of union interest for the employees and lack of union support were:

(1) The number of employees who authorized dues checkoffs had fallen from a high of 59 to 49 out of 156 employees in the unit;[6]

4. The content of this conversation was taken from Ferguson's testimony. Although Sheets denied parts of the conversation, neither the trial examiner nor the Board resolved the conflict in testimony. Ferguson's testimony was credited in all other regards.

5. The Board claims that this flyer emphasized the relationship between paying membership and bargaining strength, not lack of majority status. The company took this letter as a sign of weakness.

6. The company cites Convair Division of General Dynamics Corp., 169 N.L.R.B. No. 26, 1968–1 CCH NLRB 28,997, 28,-

999 (1968), as authority that a low number of checkoff authorizations may be taken into effect when assessing a union majority, although that fact, if standing alone, could not justify a refusal to bargain. In that case, the Board held that in light of all the circumstances the employer was justified in interpreting "the decrease in the number of unit employees on the checkoff list as reflecting also a proportionate decrease in the extent of the Union's overall support within the unit." The Board contends, and the company agrees, that there may be employees who support the union but do

(2) The union had processed to arbitration none of the 32 grievances it had filed;

(3) The union had ignored its right under the collective bargaining agreement to recommend employees for job promotions;

(4) Under its right to police plant safety procedures monthly, the union had been four months late in appointing a safety committee, had made no monthly tours, and had toured the plant only when a state inspector so requested;

(5) The union was lax in exercising its right to designate twelve employees for superseniority; and

(6) There had been a significant turnover in work force, indicating that there were then fewer employees supporting the union than at the time of the original election.[7]

Although the Board attacks each of the reasons advanced by the company in support of its good faith doubt of the union's majority status, the company does not rely on any one reason alone, but rather on all as a whole. We think the entire record, including evidence against the Board's position as well as in favor of it, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), supports the company's position. We note that the union's majority has never actually been asserted by the Board and, in fact, is in serious doubt from the record. *See* L. C. Cassidy & Sons, Inc. v. NLRB, 415 F.2d 1358, 1365 (7th Cir. 1969).

The Board further argues that a company which has committed unfair labor practices calculated to undermine the union's majority cannot rely on loss of that majority in defending an 8(a) (5) charge. NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091, n. 4 (8th Cir. 1969); C & C Plywood Corp., 163 N.L.R.B. 1022, 1023 (1967), enforced, 413 F.2d 112, 115–116 (9th Cir. 1969). This rule applies when the unfair labor practices occur before the loss of majority or the refusal to recognize a union on the basis of such a loss. In the instant case, however, only two 8(a) (1) violations occurred before the company withdrew recognition from the union and these were of a minimal nature as regards any significant erosion of union strength. Also, the Board did not base its bargaining order on a finding that the company's 8(a) (1) violations were so pervasive and had so undermined the union as to compel such a remedy. *See* NLRB v. Flomatic Corp., 347 F.2d 74, 77–78 (2d Cir. 1965). Therefore, the reasoning of the *Little Rock Downtowner* and *C & C Plywood* cases does not apply here.[8]

not authorize checkoffs. General Electric Co., Battery Products, Cap. Dept. v. NLRB, 400 F.2d 713, 727 n. 14 (5th Cir. 1968). The company argues, however, that when the ratio of checkoff authorizations to pro-union votes in the election is applied to the number of new employees brought into the unit as the result of employee turnover, a total of only 62 employees (39.7%) in the unit are shown to have supported the union on October 17, 1967. We agree that this type of computation of actual union strength is properly considered by an employer in determining majority status.

7. The company cites Capital Aviation, Inc. v. NLRB, 355 F.2d 875, 877 (7th Cir. 1966), as indicating that such consideration was proper. See also NLRB v. H.

P. Wasson & Co., 422 F.2d 558 (7th Cir., No. 17142, Feb. 12, 1970), 561, where this court held that a "large turnover and the decrease in check-off cards could reasonably give rise to genuine doubts" of the certified union's continued majority support.

8. We agree with the Board that unfair labor practices occurring after the withdrawal of recognition may be considered in assessing the employer's good faith. In Quaker State Oil Refining Corp. v. NLRB, 270 F.2d 40, 43 (3d Cir. 1959), the court, in sustaining the Board's finding that a shut-down by the employer was not motivated by a fear that a sudden strike would endanger plant and personnel, stated that "to apply hindsight in the light of what later occurred would

▉ Nor do we think the company's petitioning for an election during a period in which the Board traditionally denies such requests is evidence of bad faith by the company. The company's position has been, and still is, that an election should be called to settle the issue of the union's status. We therefore hold that the company has met its burden to "come forward with evidence casting 'serious doubt on the union's majority status'," NLRB v. Frick Company, 423 F.2d 1327, p. 1331 (3d Cir., No. 17961, April 1, 1970), and accordingly deny enforcement of the bargaining order.

▉ The remaining violations of section 8(a) (1) concern the company's unilaterally granting benefits to the employees and promises connected therewith. Since the company was justified in refusing to bargain with the union on October 17, 1967, its later grant of benefits was not a violation of the Act. Superior Engraving Co. v. NLRB, 183 F.2d 783, 792 (7th Cir. 1950). Accordingly, we deny enforcement of that part of the Board's order involving the above-mentioned conduct.

In NLRB v. Flomatic Corp., *supra*, 347 F.2d at 80, the court, in denying enforcement of a bargaining order where the 8(a) (1) violation was not flagrant, stated:

> A more appropriate remedy for the unfair labor practice found in this case would be an order requiring the employer to cease and desist from any further violations of § 8(a) (1) and directing a new election after a reasonable passage of time and an opportunity for further persuasion by the union.

not be a true assessment of the company's motives. Yet the actual events later transpiring also tend to bolster the Board's finding of fact." In the instant case, however, we do not think that the

subsequent 8(a) (1) violations destroy our holding that there was a rational basis to support a good faith doubt of the union's majority on October 17, 1967.