**DAISY'S ORIGINALS, INC. OF MIAMI,**
Petitioner-Cross Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent-Cross Petitioner.

No. 31–110.

United States Court of Appeals, Fifth Circuit.

Oct. 5, 1972.

Rehearing and Rehearing En Banc Denied Dec. 7, 1972.

Alan D. Greene, Miami, Fla., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C., Harold A. Boire, Director, NLRB, Region 12, Tampa, Fla., Daniel M. Katz, Washington, D. C., for respondent.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

A fourteen year bargaining history between a local of the International Ladies' Garment Workers' Union (I.L.G. W.U.) and Daisy's Originals, Inc. of Miami, Florida, abruptly ceased on March 18, 1968, when the company announced at a meeting of all its employees that it had received unsolicited renunciations of the union as unit bargaining agent from a majority of the unit's employees. The union denied the company's claim, and after rejecting Daisy's offer to submit the disestablishment letters and petitions to a neutral party for ratification, a procedure usually sponsored by a union seeking to obtain recognition by

card count, *see* N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), filed unfair labor practice charges against Daisy's. On May 3, 1968 the union went out on strike.

The National Labor Relations Board, in an opinion reported at 187 N. L. R. B. 15, agreed with the Trial Examiner (now administrative law judge) that the strike was an unfair labor practice strike caused in material part by Daisy's sophisticated and subtle plan to undermine the union. The board found that the company had committed independent violations of § 8(a) of the Act, 29 U.S. C. § 151 et seq., and that such violations prevented the company from asserting the union's loss of majority in defense of its refusal to bargain with the union. Consequently, the board found the company in violation of § 8(a)(5) of the Act and issued an order requiring the company to bargain with the union on demand. Daisy's has petitioned for review and the board cross-petitioned for enforcement of the order.

■ In this, as in any other labor case, the particular facts are especially critical. While Daisy's objects to the trial examiner's credibility determinations, we are bound under Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), to accept factual determinations which are supported by substantial evidence on the record taken as a whole, and are prohibited from trying a case *de novo* simply because we might have reached a contrary conclusion if this were the court of original jurisdiction. The facts supported by this record sustain the board's imposition of § 8(a)(1) violations arising out of three meetings conducted by Daisy's president, Renato Levi, on February 23, March 8 and March 18, 1968. By way of background the meetings appear to have been called to explain a personalized letter which Levi had sent to each of Daisy's employees in January 1968. The letter, an exemplar of which is set out in the margin [1] was personally addressed and indicated the amount of benefits which Daisy's had placed in trust with the union for payment of vacation and other benefits of all unit employees, both union and nonunion members. The letter continued and addressed itself to some rumors reportedly circulating in the shop to the effect that the union would not disburse the contract benefits unless the claimant were a paid-up member of the local. Employee reaction to the letter was predictable and swift, and within the next few days questions were thrown at the union's stewards, asking, among other things, "How do we get out our money?" The union thereupon arranged a meeting with Levi to protest the letter. The

---

[1] "January, 1968

Ruth Menes:

We are pleased to inform you that during the year 1967, Daisy's has placed in trust for you, $247.70 for vacations, holiday pay, health and welfare, unemployment-severance, and retirement benefits.

This is *your* money; you earned it and we paid it out on your behalf.

However, we have heard rumors that some members have not been able to receive these benefits unless they first paid dues to a union. If this is so, we are as shocked as you must be that this practice is taking place.

We wish to inform you that as an employee of Daisy's, you are entitled to *all* the benefits enjoyed by you and your fellow employees whether you are or are not a member of any union, and whether you pay or do not pay any union dues. To deny you these benefits because you have not joined a union or because you have not paid union dues is not only unfair to you and to us, but is completely unlawful and should be reported.

We repeat, this is *your* money, regardless of whether you are or are not a member of any union, or have not paid union dues. Accordingly, we believe you deserve to be told of your money which we have set aside for you, and we have taken this opportunity to do so.

Thank you for your good work during the past year.

Sincerely,
Renato Levi
President"

board's opinion, in its statement of facts, says of this meeting:

"The union protested the letter, stating that the rumors were untrue, and Levi replied, 'Okay, so I made a booboo, I shouldn't have sent the letter.' In fact no such rumors existed and this record shows no basis for asserting that there was such a rumor circulating among employees."

■ We are doubly fortunate that the views of one board member did not prevail and that the January letter did not become an independent unfair labor practice. First, such a finding would present us with an extremely vexatious problem under § 8(c) of the Act, which provides as follows:

"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

Secondly, the factual statement concerning the rumors is the product of a record open to a substantial due process challenge. Daisy's was not permitted to cross-examine the witness the trial examiner had determined to be credible in this regard. We cannot, therefore, base unfair labor practice charges solely on the factual assertion there were no rumors. There is, however, substantial evidence to support unfair labor practice charges. As noted, the January letter

helped produce the February 23rd meeting. Levi exercised his § 8(c) freedom and distributed a booklet to all (both unit and non-unit) employees describing the regulations at Daisy's and the greater benefits available only to the non-bargaining unit employees. Shortly after the booklet was released the union officials again met with Levi, this time to protest the distribution of the booklet at a time when anti-union disestablishment petitions were being circulated by Daisy's employees.

Levi acknowledged the protest but denied any anti-union animus or knowledge of the disestablishment petitions. The record moreover reflects that with but one exception the company and its supervisors were in no manner directly connected with the circulation or solicitation of these petitions.[2] However, the record demonstrates that as of this meeting the company was placed on actual notice of the existence of these petitions, when in Levi's presence and with his permission the union interrogated two employees it suspected of circulating the petitions. Both admitted the existence of the petitions and their participation.

Daisy's work force is primarily Cuban and Spanish speaking. On March 8, Levi called a second all-employee meeting during which he distributed a Spanish language edition of the benefit booklet. At this meeting he made a speech directed to rumors of union misconduct. The trial examiner, with ample support in the record, found the iron

2. The incident was isolated, affecting one employee. Similar isolated episodes of threatening mass firings if the union lost, or of moving the shop if the union won are found in this record. The board found:

"And, although we agree with the Trial Examiner that, except for the Satterwhite-Olliff incident, there is no evidence that the Respondent actively participated in the anti-Union campaign or directly solicited employees to sign anti-Union letters and petitions before March 18, we consider such a finding unnecessary herein. For the na-

ture of the Respondent's communications, including the specific 8(a)(1) violations, directed as they were to instigating just such repudiation of the Union, albeit subtly and somewhat by indirection, and including specific indications that employees should reject the Union, that employees would enjoy greater benefits without the Union, and that Respondent no longer wished to deal with it, lead to the inevitable inference that the letters and petitions were the direct and intended product of those activities."

fist in the velvet glove manifested itself at this meeting. The situation arose when Levi abandoned his prepared text to extemporaneously answer several questions from the floor. A unit employee asked if he would be able to receive the great non-unit benefits. Levi reportedly told him to make up his own mind and go either way, gesturing with the booklet. When the union steward present at the meeting then asked Levi what he meant and what decision the employees had to make, Levi reportedly told her, "Don't vote for the union."

Between the March 8th and March 18th meetings the company received the bulk of the disestablishment petitions. By March 18th a clear majority of unit employees had indicated a preference to disestablish the union as their exclusive bargaining representative. The March 18th meeting advised the union of its loss of majority and was the first refusal to bargain.

### THE 8(a)(1) VIOLATIONS

The board found with respect to the letters and speeches that "a clear pattern emerges of increasing references to nonexistent rumors in the plant of various forms of alleged misconduct by the union and to employee withdrawal from the union to obtain the greater benefits enjoyed by non-unit workers. It is apparent, as the trial examiner found, that [Daisy's] was engaged in a campaign, subtle and sophisticated, to increase dissention in the shop and weaken the union's bargaining power." With respect to the board's finding concerning the rumors, we have already acknowledged the due process fault in the hearing process and decline to enforce an order based on a finding negating the presence of rumor. Were it not for this failing we could evaluate the board's assessment within the purview of § 8(c) of the permissible scope of employer expression in the context of its setting. Sinclair Co., 164 N.L.R.B. 49, enforced 397 F.2d 157 (1st Cir., 1968), aff'd sub nom. Gissel Packing Co. v. N. L. R. B., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ The board's conclusions that Levi violated § 8(a)(1) of the Act by his implied promise of benefit to his employees if they were not covered by a contract with the union are supported by this record. Indeed, Daisy's agreed that should it lose on the review of the trial examiner's credibility determinations of the actual events at the March 8th meeting, it was guilty of a violation under § 8(a)(1), albeit in its view a minor technical violation. The crux of the dispute concerns the scope of the board's chosen remedy, a bargaining order.

### THE BOARD'S BARGAINING ORDER

The board found as follows:

"Under all the circumstances, we are persuaded, and find, that the circulation and signing of the anti-Union letters and petitions resulted largely, if not entirely, from the Respondent's conduct and that this solicitation was prompted and furthered by the Respondent both directly and indirectly. Since the Respondent therefore cannot rely on these rejections to sustain its assertion that it had valid grounds for doubting the Union's continued majority status, Respondent was under a continuing duty to bargain."

The board, therefore, ordered Daisy's to bargain.

■ We are well aware of the scope of the board's powers in fashioning a remedy under § 10(c) which will "effectuate the policies of this Act." Deferral to the board's statement of the appropriate remedy is not a mere lip service formulation. The Supreme Court has repeatedly admonished that "the relation of remedy to policy is peculiarly a matter for administrative competence," and that the "Act does not create rights for individuals which must be vindicated according to a rigid scheme of remedies." Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Moreover, the board's choice of a specific remedy should be sustained unless it is in excess of the board's statutory authority. H. K. Porter Co. v. N.

L. R. B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964). We are also aware of the line of cases which have sustained the board's imposition of a bargaining order to remedy an employer's unlawful dissipation of a union's majority. In its most recurring form the order is stated in terms that an employer's belief that the union has lost its majority does not excuse his refusal to bargain where the loss of majority issue is "raised by the employer in a context of illegal anti-union activities, or other conduct by the employer aimed at causing disaffection from the union." C&C Plywood Corp., 163 N.L.R.B. 1022 (1967). The mere facts that the employer's tactics are successful does not prevent the imposition of a bargaining order. N. L. R. B. v. Gissel Packing Co., *supra*; N. L. R. B. v. Katz, 369 U.S. 336, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); N. L. R. B. v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 826, 94 L.Ed. 1067 (1950); N. L. R. B. v. Warren Co., 350 U.S. 107, 76 S. Ct. 185, 100 L.Ed. 96 (1950); Frank Bros. v. N. L. R. B., 321 U.S. 702, 64 S. Ct. 817, 88 L.Ed. 1020 (1944).

■ The remedy chosen, however, must be primarily remedial as opposed to punitive in nature, Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), and should not stand if it "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec. & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). In cases in which a bargaining order has been deemed appropriate the employees have been stripped of their § 7 right to refuse unionization in order to remedy the wrongdoings of their employer. The rationale of these cases has been that the employees' loss of rights is only temporary (at a minimum of one year be-fore a decertification petition can be filed.) The Supreme Court in *Gissel*, in approving a bargaining order based on the employers' unlawful dissipation of a union's card majority, referred to the tension between effectuating the policy of the Act to remedy misconduct and employee freedom of choice. The Court, quoting *Frank Bros.*, 321 U.S. 702, 64 S.Ct. 817, said:

> " . . . For, as we pointed out long ago, in finding that a bargaining order involved no 'injustice to employees who may wish to substitute for the particular union some other . . . arrangement,' a bargaining relationship 'once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed,' after which the 'Board may, . . . upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.' "

In the administrative process by which unfair labor practice charges are resolved, the trial examiner, having once factually determined the validity of the charge, will draft a proposed order. His is the first opportunity to balance the considerations of remedy and freedom of choice. Here the trial examiner stated:

> "Conceding, as one must, that the issue presented is as close as might be found, I find Respondent violated Section 8(a)(5) of the Act. Since the issue, both as to law and fact, is so close I do not believe extended dissertation by the Trial Examiner will contribute to the disposition of the case. The case properly goes to the Board for application of its expertise and then to the Court of Appeals for review. In finding Respondent guilty under the statute I do not find that the unfair labor practices committed were sufficiently flagrant so that an election could not be held or should be set aside under the *Gissel* rule. I would, however, lower the require-

ments of *Gissel* where the parties have engaged in collective bargaining for a period of some 14 years and the Union has been dispossessed of its bargaining status by Respondent's conduct, whether or not in flagrant violation of the Act.[38] This is stretching *Gissel* to its farthest reaches but where a Union has enjoyed continuous bargaining status I would apply a different standard than to those cases, which involved initial organizing activity in non-union plants, which were before the court in *Gissel*."

The board adopted without modification this portion of the trial examiner's opinion.

The trial examiner's conclusion takes this case out of the narrow holding of *Gissel, supra,* for in the three cases there decided a factual determination had been made that the unfair labor practice committed tended to preclude the holding of a fair election. Indeed, the Supreme Court reserved our case for another day, stating: "[W]e need not decide whether a bargaining order is ever appropriate in cases where there is no interference with the election processes." 395 U.S. at 595, 89 S.Ct. at 1930. The Court there characterized its holding as one of limited effect: "The only effect of our holding here is to approve the Board's use of the bargaining

order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S.Ct. at 1940.

■ The *Gissel* holding has led to the characterization of three kinds of unfair labor practices, two of which will support a bargaining order. The first are those cases in which "outrageous and pervasive" unfair labor practices have occurred. Bargaining orders there are appropriate without inquiry into the present majority status of the union. Second, where a union has made a showing of majority representation and has lost that majority through employer misconduct which "have the tendency to undermine majority strength and impede the election processes", the board has the discretion to issue a bargaining order. This second category by no means calls for the per se imposition of a bargaining order, *Gissel, supra. See,* N. L. R. B. v. Lou De Young's Market Basket, Inc., 430 F.2d 912 (6th Cir., 1970), for examples. The board is required to look to the factual context of the misconduct, its likelihood of recurrence and its impact on further elections.[3] N. L. R. B. v. American Cable Systems, Inc., 427 F.2d 446 (5th Cir., 1970). Third, where the unfair la-

3. The presence of anti-union employee activity before the January letter, and the absence of the board's finding that letter an unfair labor practice factually distinguish this case from Judge Ainsworth's recent opinion in N.L.R.B. v. Thompson, Inc., 449 F.2d 1333 (5th Cir., 1971), cert. den., 405 U.S. 1065, 92 S.Ct. 1499, 31 L.Ed.2d 795 (1972). There the court in dicta stated that a bargaining order is appropriate "even in the absence of proof that the Union's loss of majority was attributable to the unfair labor practices which had been perpetrated by the Company" 449 F.2d at 1337.

In light of the Supreme Court's decision in *Gissel,* the court's statement here can only be taken to be a recognition that a direct casual link between the commission of those unfair labor practices which support a *Gissel* order and a union's loss

of majority need not be shown. The enforcement of a bargaining order must turn on the standard announced in J. P. Stevens & Co., Inc., Gulistan Division v. N.L.R.B., 441 F.2d 514 (5th Cir., 1971). Judge Goldberg there stated:

" . . . The Board must, on the objective facts, determine the seriousness of the employer unfair labor practices and consider the possibility of a fair rerun election. Note, NLRB v. Gissel Packing Co.: Bargaining Orders and Employee Free Choice, 45 N.Y.U. L.Rev. 318 (1970). Once the Board has done so, if supported by substantial evidence, its bargaining order must be enforced. Since we have found that the Board's conclusions are indeed amply supported by the record, we also enforce that portion of its order requiring Stevens to bargain with the Union."

bor practices have had a minimal impact on the election machinery such that an election could be held, the board is not authorized to enter a bargaining order. *Gissel, supra*; Stevens & Co., Inc., Gulistan Division v. N. L. R. B., 441 F.2d 514 (5th Cir., 1971); N. L. R. B. v. Lou De Young's Market Basket, Inc., *supra*. The trial examiner's conclusion that an election could be held, but that a bargaining order was justified in the third class of case when the union involved was an incumbent, raises grave doubts about the propriety of a bargaining order under *Gissel*.

The board suggests that the bargaining order is available in this case under the pre-*Gissel* cases of *Katz, supra*; *Mexia Textile Mills, supra*, and *Frank, supra*, and that it is especially appropriate to remedy employer induced disaffection from an incumbent union.

■ There is no doubt since *Gissel* that the duty to bargain in good faith with a majority union in an appropriate bargaining unit attaches under § 8(a)(5) regardless of in which lawful manner the union obtained and manifested its majority.

The I.L.G.W.U. had been the exclusive bargaining agent for Daisy's unit employees for over fourteen years as of the filing of the subject unfair labor practice charges. During that time and at its inception the union had not been certified by the Board, nor had the employees ever had the opportunity to cast a ballot for or against the union. Indeed, Daisy's has responded to the board's *Frank Bros.* argument by confessing that it violated § 8(a)(2) when it imposed the I.L.G.W.U. on its employees. Compare Retail Clerks Intern. Ass'n etc. v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). This confession is in the nature of an attack on the lawfulness of the union's majority and is not timely in this proceeding. International Assoc. of Machinists, AFL–CIO (Bryan Mfg. Co.) v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960); N. L. R. B. v. Dis-

trict 30 UMW, 422 F.2d 115 (6th Cir., 1969), cert. den. 398 U.S. 959, 90 S.Ct. 2173, 26 L.Ed.2d 543 (1970). Additionally, it is evident that Daisy's employees have not felt themselves coerced into the union for, as the record demonstrates, not all unit employees were union members. The element of coercion so critical to the determination of a violation of § 8(a)(2) is absent from the unionization of Daisy's. Compare Carpenter's Local 60 v. N. L. R. B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). The board, therefore, properly rejected this attack on the union's majority.

The board argues that the attempted "reverse-*Gissel*" fails because of Daisy's commission of unfair labor practices before the union's loss of majority. The board suggests that a true "reverse-*Gissel*" occurs only when the employer properly withdraws recognition—and hence has not violated § 8(a)(5)—and then commits unfair labor practices in violation of § 8(a)(1). Accord, Ingress-Plastene v. N. L. R. B., 430 F.2d 542 (7th Cir., 1970); Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665 (8th Cir., 1970). The issue, however, whether this be regarded as a true "reverse-*Gissel*" or merely a false positive, is the appropriateness of the bargaining order.

■ Daisy's throughout has manfully sought to transpose the *Gissel* continuum of unfair labor practice from the card majority dissipation of its birth to the dissipation of incumbent unions. The facts of *Gissel* are certainly dissimilar, but the policy considerations are not. A fledgling union's right to bargain in good faith is as strong as the incumbent's of fourteen years. An employer, be he presented with a card majority or demand of an incumbent union, must bargain in good faith or respond to an unfair labor practice charge from his refusal. A defense to both is the presence of a substantial good faith doubt of the union's majority. *Gissel, supra*, 395 U.S. at 609, 89 S.Ct. 1918; Aaron Brothers, 158 N.L.R.B. 1077. Neither employer may engage in conduct

violative of § 8(a)(1) or (3) and then assert the loss of majority as a good faith doubt. Compare J. P. Stevens & Co., Inc., Gulistan Division v. N. L. R. B., *supra*, with N. L. R. B. v. Gulfmont Hotel Co., 362 F.2d 588 (5th Cir., 1966). Should the standards differ for imposition of a bargaining order imposed against either employer? We think not. Neither the incumbent nor card majority employer should lose his defense of a good faith doubt to the board's findings of independent unfair labor practices which do not tend to dissipate the union's majority and which do not even tend to cloud the holding of a board supervised election. Cf. Ingress-Plastene, Inc. v. N. L. R. B., 430 F.2d 542 (7th Cir., 1970); Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665 (8th Cir., 1970); N. L. R. B. v. Lou De Young's Market Basket, Inc., *supra*.

An additional consideration is raised by this record. The record demonstrates that Daisy's conduct was not the genesis of its employees' desire to rid themselves of their exclusive bargaining agent. It is moreover undisputed that Daisy's did not circulate or actively foster the disestablishment petitions. Those employees, their disaffection untainted by Daisy's subsequent misconduct, have been frustrated in their desire to obtain an election to determine their § 7 right not to be represented. They have been locked in by a combination of board policies. Daisy's, upon receipt of the petitions and letters, sought a decertification election under § 9(c) of the Act until reminded that the contract barred petition under the board's rules announced in Deluxe Metal Furniture Co., 121 N.L.R.B. 995 (1958). Before the expiration of the contract and its bar, the union had filed the subject unfair labor practice charges thereby invoking the board's blocking charge doctrine. Templeton v. Dixie Color Printing Co., 444 F.2d 1064 (5th Cir., 1971); Surratt v. N. L. R. B., 463 F.2d 378 (5th Cir., 1972). We may additionally take notice that under the board's interpretation of the blocking charge doctrine an·

election was unavailable in this case. N. L. R. B. Field Manual ¶ 11730. Moreover, enforcement of the bargaining order would continue this state of affairs for the mandated additional year of representation which follows imposition of such an order. Mar-Jac Poultry, 136 N. L.R.B. 785 (1962).

■ We have previously recognized that the board may impose a bargaining order on "at least two grounds: (1) the refusal to let an employer benefit by his own wrongs and (2) the insistence that a union which has won the right to bargain is allowed to enjoy that right." General Electric Co. Battery Prod., Cap. Dept. v. N. L. R. B., 400 F.2d 713, 730 (5th Cir., 1968). Accord, N. L. R. B. v. A. W. Thompson, Inc., 449 F.2d 1333, 1337 (5th Cir., 1971). But the wrong from which the employer may not benefit must be directed to the union's loss of majority or the board will have breached its assurance to the Supreme Court in *Gissel*, 395 U.S. at 609, 610, 89 S.Ct. 1918. Compare, N. L. R. B. v. Dan River Mills, 274 F.2d 381 (5th Cir., 1960), noted 395 U.S. at 609, n. 30, 89 S.Ct. 1918. Moreover, if the employer's wrongful conduct is not such as to impair the employees' exercise of freedom of choice, the bargaining order has no reason for its imposition, unless it be to deter future misconduct. Though the prophylactic purpose of such an order can be as readily obtained by entry of a cease and desist order, the Court in *Gissel* recognized such a purpose. Again, however, the Court stated that purpose in terms of vindicating employee freedom of choice when the election process had been damaged:

"If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful cam-

paign." 395 U.S. at 612, 89 S.Ct. at 1939.

 ·We think the need to effectuate employee freedom of choice is as equally an important goal as is the need to deter and remedy employer misconduct. In balancing between these two important goals the board must derive a remedy which "effectuate the policies of this Act." Our duty as an appellate court in such a case is not to "abdicate the conventional judicial function . . . . Congress has imposed . . . responsibility for assuring that the Board keeps within reasonable grounds." *Universal Camera Corp., supra,* 340 U.S. at 490, 71 S.Ct. 466. Where the unfair labor practices found have not been determined to be "sufficiently flagrant so that an election could not be held or should be set aside under the Gissel rule," a bargaining order remedy to technical violations of § 8(a)(1) is unwarranted. N. L. R. B. v. Nu-Southern Dyeing & Finishing, Inc., 444 F.2d 11 (4th Cir., 1971); Fremont Newspapers, Inc. v. N. L. R. B., *supra;* Ingress-Plastene, Inc. v. N. L. R. B., *supra.*

 We, therefore, deny enforcement of §§ 1(b) and 2(b) of the board's order and those sections shall be stricken therefrom. Since the strike was in part a response to Daisy's violation of § 8(a)(1), the strikers were unfair labor practice strikers entitled to reinstatement. Southwestern Pipe, Inc. v. N. L. R. B., 444 F.2d 340 (5th Cir., 1971).

The board's order shall be enforced as amended.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active ser-

vice not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.