**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TAHOE NUGGET, INC., d/b/a Jim Kelley's Tahoe Nugget, Respondent,**

**Hotel, Motel and Restaurant Employees and Bartenders' Union, Intervenor.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEVADA LODGE, Respondent,**

**Hotel, Motel, Restaurant Employees and Bartenders' Union, Local 86, Intervenor.**

**Nos. 77–2095, 77–2105.**

United States Court of Appeals, Ninth Circuit.

Aug. 10, 1978.

Rehearing and Rehearing En Banc Denied Oct. 20, 1978.

Charles Donnelly (argued), Washington, D. C., for petitioner.

J. Mark Montobbio (argued), San Francisco, Cal., for respondent.

Before TRASK and ANDERSON, Circuit Judges, and GRANT,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Pursuant to 29 U.S.C. § 160(e), the National Labor Relations Board has petitioned for enforcement of its Orders against respondents. The Board, affirming the findings made by an Administrative Law Judge in separate hearings,[1] found respondents Tahoe Nugget and Nevada Lodge violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the Act). We grant enforcement.[2]

In 1959, the Reno Employers Council (the Association), a voluntary combination of restaurant and casino employers, entered into a collective bargaining agreement with Union Local 86 (the Union).[3] Soon after it opened in 1958, Nevada Lodge joined the Association; Tahoe Nugget joined after opening for business in 1962.[4] A series of three-year contracts, the last expiring on November 30, 1974, recognized the Union and set terms and conditions of employment for all Association members. By joining the Association, both respondents recognized the Union as bargaining representative for its employees; an election has never been held in either single employer unit or in the multi-employer unit.

On September 17, 1974, Nevada Lodge withdrew from the Association; on October 25, it refused to recognize or bargain with the Union. Tahoe Nugget took the same action on September 18 and October 23, respectively. The withdrawals were timely.[5] In November, the Union filed unfair labor practice charges against respondents. Subsequently, each employer filed an election petition, but under established Board practice, the elections were stayed pending the outcome of the unfair labor practice charges.

The Union alleged that respondents' refusal to bargain violated section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), and that respondents subsequently interfered with the free exercise of employee rights in violation of section 8(a)(1), 29 U.S.C. § 158(a)(1). The refusal to bargain charge was premised on the Union's presumed majority status. Respondents defended by introducing evidence to show their refusal was based on a reasonable doubt of the Union's majority.[6] The Board found respondents' proof unconvincing.

The 8(a)(1) violations charged were of two varieties: dependent and independent. The dependent 8(a)(1) charges flowed from the refusal to bargain: by refusing to bargain with the employees' bargaining representative, the employer interferes with the employees' organizational rights and thereby violates 8(a)(1), if the refusal is not justified. The Board upheld these charges inasmuch as the refusal to bargain had been

---

* The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation.

1. In *Tahoe Nugget*, the first of the two cases to reach the Board, the Administrative Law Judge's decision was affirmed "for the reasons set forth . . . [in the Board's Decision and Order] rather than for the reasons set forth in his Decision." We find the Board's opinion only clarifies and narrows the rationale relied on by the Administrative Law Judge. The Board's decision and order in No. 77–2095 is reported at 227 NLRB No. 72 and in No. 77–2105 at 227 NLRB No. 73.

2. At oral argument, respondents conceded the Board had jurisdiction. Our jurisdiction is clear. See 29 U.S.C. § 160(e), (f).

3. Hotel-Motel Restaurant Employees & Bartenders Union, Local 86, Hotel Restaurant Employees & Bartenders International Union, AFL–CIO.

4. The record does not show whether either respondent recognized the Union before joining the Association. Inasmuch as both respondents joined the Association soon after opening for business, it is unlikely either respondent did recognize the Union before then.

5. *See generally NLRB v. Sheridan Creations, Inc.,* 357 F.2d 245 (2d Cir. 1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967).

6. Evidence to show the Union was actually in the minority was also offered, but the evidence was clearly insufficient and therefore will not be discussed.

adjudged unlawful.[7] The independent 8(a)(1) charges stemmed from unilateral wage and benefit increases instituted after the collective bargaining agreement expired. These charges were also sustained by the Board.

Respondents' primary contentions on appeal are:

1. The presumption of majority status is inapplicable; and
2. A reasonable doubt has been proved.

The presumption endorsed by the Board must be upheld unless it fails to evenhandedly further the Act's purpose.[8] The Board's factual findings must be sustained if supported by substantial evidence in the record considered as a whole.[9]

## THE PRESUMPTION

■ To sustain an 8(a)(5) charge, the General Counsel must show the union represented a majority of the unit employees when the employer refused to bargain. The Board employs two presumptions obviating an evidentiary showing of majority status. For a reasonable time, usually one year, after certification or voluntary recognition, majority support is irrebuttably presumed absent "unusual circumstances."[10] After one year, the presumption becomes rebuttable. Absent sufficient countervailing proof, the presumption establishes, without more, the employer's duty to bargain. *NLRB v. Tesoro Petroleum Corp.*, 431 F.2d 95, 97 (9th Cir. 1970).

Respondents contend a presumption cannot have such efficacy under rule 301, Federal Rules of Evidence.[11] Only a superficial reading of the rule supports this contention. The courts have approved the presumption's use and force in reviewing 8(a)(5) violations, both before and after the adoption of the Federal Rules of Evidence.[12]

The presumption is rebutted if the employer shows, by clear, cogent, and convincing evidence,[13] that the union was in the minority or that the employer had a good faith reasonable doubt of majority support at the time of the refusal.[14] Some courts view these as complete defenses;[15] other courts say they simply shift the burden to the General Counsel.[16] Since the General

---

7. In *Nevada Lodge*, an additional 8(a)(5) violation was based on respondent's refusal to bargain about a dental insurance plan. Since granting the dental plan was also found to constitute an independent 8(a)(1) violation, we do not determine whether respondent's defense of contractual waiver should have been upheld by the Board.

8. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 681 n. 1, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030 (8th Cir. 1976); *NLRB v. Leatherwood Drilling Co.*, 513 F.2d 270, 272 (5th Cir. 1975), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

9. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

10. *NLRB v. Lee Office Equipment*, 572 F.2d 704, 706 (9th Cir. 1978). One such "unusual circumstance" is a radical change in the size of the unit. *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

11. "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."
Fed.Rules Evid., Rule 301, 28 U.S.C.

12. *E. g., NLRB v. Vegas Vic, Inc.*, 546 F.2d 828 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1978); *NLRB v. Tragniew*, 470 F.2d 669 (9th Cir. 1972).

13. *Pioneer Inn Associates v. NLRB*, 578 F.2d 835 (9th Cir. 1978); *Orion Corp. v. NLRB*, 515 F.2d 81, 85 (7th Cir. 1975); *see NLRB v. Tragniew*, 470 F.2d at 674–75. As applied to the reasonable doubt defense, this criterion is primarily directed to the type of evidence relied upon; the standard of proof is unchanged, to wit: whether there is sufficient reliable evidence to cast serious doubt on the union's majority. *See Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 489–90 (2d Cir. 1975).

14. *NLRB v. Vegas Vic, Inc.*, 546 F.2d at 829.

15. *E. g., NLRB v. Dayton Motels, Inc.*, 474 F.2d 328, 332 (6th Cir. 1973).

16. *E. g., Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 (9th Cir. 1977); *Na-*

Counsel usually relies on the presumption alone, as he did here, the distinction is primarily academic.

Proving minority status is a straightforward factual question. When the employer seeks to rely on the less exacting standard of reasonable doubt, he must also show the doubt was entertained in good faith. *Orion Corp. v. NLRB*, 515 F.2d 81, 85 (7th Cir. 1975).

Respondents sought to substantiate their factual defense by showing the Union did not enjoy majority support at the time of voluntary recognition. The showing was disallowed as time barred.

In *Bryan Manufacturing*,[17] the Supreme Court held that the six-month statute of limitations for filing unfair labor practice charges contained in § 10(b) of the Act can also act as an evidentiary bar. The issue arose when an employer recognized a minority union and entered into a collective bargaining agreement with it. No unfair labor practice charges were filed for ten months. The Board upheld the charges, reasoning that execution of the agreement was a continuing violation. The Supreme Court reversed, holding that § 10(b) precluded a challenge to the union's majority position.

Two situations were differentiated. The Court said when events within the six months preceding the filing of charges "may constitute, as a substantive matter, unfair labor practices," evidence showing earlier unfair labor practices is admissible to clarify the more recent events. When, however, the recent events violate the Act only if an earlier unfair practice occurred, the prior events are not merely evidentiary

tional *Cash Register Co. v. NLRB*, 494 F.2d 189, 194 (8th Cir. 1974).

17.  Local Lodge No. 1424, *International Association of Machinists, etc. v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 540 (1960).

18.  Compare majority and dissenting opinions in *NLRB v. Dayton Motels, Inc.*, 474 F.2d 328 (6th Cir. 1973) for contrasting views on what *Tragniew* portends here. *See also NLRB v. Denham*, 469 F.2d 239 (9th Cir. 1972), *vacated*, 411 U.S. 945, 93 S.Ct. 1925, 36 L.Ed.2d 407 (1973).

and evidence thereof is inadmissible. The facts in *Bryan Manufacturing* fell into the second category because enforcement of the agreement was illegal only if its execution were an unfair labor practice.

Here we are presented with the other side of the coin. Respondents intended to use the evidence defensively to prove their conduct was lawful. Respondents argue the evidence clarifies their subjective motivation and is therefore admissible to prove their good faith doubt defense.

In *NLRB v. Tragniew, Inc.*, 470 F.2d 669 (9th Cir. 1972), this court held that evidence of an unfair labor practice that occurred beyond the 10(b) period could not be admitted in defense of a refusal to bargain charge. *Accord, Lane-Coos-Curry-Douglas Counties Building and Construction Council, AFL–CIO v. NLRB*, 415 F.2d 656, 659 n. 7 (9th Cir. 1969). Other courts agree that under *Bryan Manufacturing* a defunct unfair practice claim cannot be revived to defend subsequent charges. *E. g., NLRB v. District 30, United Mine Workers of America*, 422 F.2d 115, 122 (6th Cir. 1969), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2173, 26 L.Ed.2d 543 (1970). In *Tragniew*, however, the employer had not attempted to avail himself of the good faith doubt defense, but only tried to prove the union was in the minority. Consequently, the court did not consider the precise question raised by respondents.[18]

The defense respondents press has two parts:

1.  objective facts sufficient to support a reasonable doubt; and

2.  the employer's good faith.[19]

In *Daisy's Originals, Inc. of Miami v. NLRB*, 468 F.2d 493, 501 (5th Cir. 1972), the court did apply the *Bryan Manufacturing* rule to disallow an attack on the union's initial majority when the employer had raised the reasonable doubt defense. There, however, the focus was on the effect of certain unfair labor practices, and it is unclear whether the distinction pressed by respondents was raised.

19.  These criteria comprise two corollaries:
1.  the perceived decline in union support must not be attributable to employee misconduct; and

*NLRB v. Cornell of California, Inc.*, 577 F.2d 513, # 76–1545 (9th Cir. 1978). The Sixth Circuit has held in similar circumstances that evidence otherwise time barred is admissible to substantiate the second part of the defense presented here.

In *NLRB v. Dayton Motels, Inc.*, 474 F.2d 328 (6th Cir. 1973), the employer sought to defend refusal to bargain charges by showing that union authorization cards, obtained more than six months previously, were procured fraudulently. The court held that evidence to support this defense was admissible. The employer does not resurrect a stale claim by showing the original authorization cards were obtained through fraud, the court reasoned, but only proves that the employer acted in good faith.

We think this misperceives the essence of the good faith criterion. The good faith criterion is ordinarily satisfied if, at the time the employer challenges the union majority, the employer has knowledge of the facts which give a reasonable basis for doubting the union's majority.[20] The good faith criterion is unconcerned with the employer's subjective motivation; its focus is empirical and objective. *See NLRB v. Vegas Vic, Inc.*, 546 F.2d 828 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1978). What the employer knew is determinative, not why he challenged the union's position. *See Automated Business Systems v. NLRB*, 497 F.2d 262 (6th Cir. 1974); *NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588, 589 (5th Cir. 1966); Seger, *The Majority Status of Incumbent Bargaining Representatives*, 47 Tul.L.Rev. 961, 984 (1973).

In a parallel context, the Supreme Court has deemphasized motivation. In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the court endorsed the Board's disregard of an employer's subjective motivation in election cases:

"Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election. Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; he need give no affirmative reasons for rejecting a recognition request, and he can demand an election with a simple 'no comment' to the union. The Board pointed out, however, (1) that an employer could not refuse to bargain if he *knew*, through a personal poll for instance that a majority of his employees supported the union, and (2) that an employer could not refuse recognition initially because of questions as to the appropriateness of the unit and then later claim, as an after-thought, that he doubted the union's strength." *Id.* at 594, 89 S.Ct. at 1930.[21]

*See Komatz Construction, Inc. v. NLRB*, 458 F.2d 317, 326 (8th Cir. 1972) ("In view of the demise in *Gissel Packing* of the subjective test of an employer's good faith doubt, 395 U.S. at 608, 89 S.Ct. 1918, the proper test for rebuttal of the presumption

---

2. evidence showing the union does enjoy majority support must also be considered.
*See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); *NLRB v. Sky Wolf Sales*, 470 F.2d 827, 830 (9th Cir. 1972); *Fremont Newspapers, Inc. v. NLRB*, 436 F.2d 665, 671 (8th Cir. 1970); *Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir. 1970), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

20. *See Lodges 1746 & 743, Int'l. Ass'n of Machinists & Aerospace Workers v. NLRB*, 135 U.S.App.D.C. 53, 416 F.2d 809 (1969), *cert. de-*

*nied*, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970) (good faith can be inferred from employer's knowledge of objective grounds). We are not confronted here with a question as to the timeliness of the employer's refusal to recognize. See text at n. 5. Assumably, this is a separate consideration. *But see id.*

21. In *Gissel*, the court also approved the *Cumberland Shoe* doctrine, stating:

"We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry."
395 U.S. at 608, 89 S.Ct. at 1937.

is whether there is objective evidence sufficient to warrant a good faith doubt of the union's majority. . . . ")

■ In contrast to the situation in *Gissel Packing*, the employer must give "affirmative reasons" for challenging the union's position when asserting the reasonable doubt defense. The added burden is justified here because the Union's majority has already been established once. The Act favors stability in bargaining. Therefore, the employer must affirmatively defend his decision when he disrupts the existing relationship whereas he must only proceed in good faith when refusing to recognize the union initially.[22]

Our construction of the reasonable doubt defense also comports with the Act's emphasis on neutral employer-union conduct to ensure employees unfettered freedom regarding their organizational desires. Congressional policy with respect to unfair practices is directed to controlling misconduct: it does not require the employer to embrace the union movement's precepts. Even when anti-union motivation is a necessary element of the unfair labor practice, conduct is still the key. The subjective inquiry is necessary to determine whether the employer has acted impartially; the presence of anti-union animus is immaterial unless it prompts the misconduct. *See NLRB v. Tayko Industries, Inc.*, 543 F.2d 1120 (9th Cir. 1976); *Conolon Corp. v. NLRB*, 431 F.2d 324 (9th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971).

■ We hold the employer is free to act on the objective grounds before him, regardless of his underlying motivation. If union support is lacking, the employer's action actually furthers the cause of employee democracy by overcoming the inertia which helps maintain the status quo.[23] Since the employer's action is not in derogation of employee rights, his subjective motivation is important only evidentially.[24] In sum, when challenging the union majority, good faith is demonstrated if the employer is aware of the facts manifesting lack of union support and employer misconduct did not contribute to the loss of support.

Our conclusion is buttressed by pragmatic considerations. Administratively and evidentially, testing objective facts is simpler and more precise than probing an employer's mind.[25] Also, an objective construction

---

**22.** The two conditions enumerated in the quote from *Gissel Packing* are functionally equivalent to the good faith facet of the reasonable doubt defense. See n. 19, *supra*, and accompanying text.

**23.** *See Teamsters Local Union 769 v. NLRB*, 174 U.S.App.D.C. 310, 315, 532 F.2d 1385, 1390 (1976).

**24.** "If the employer's discriminatory conduct is inherently destructive of important employee rights, then no proof of subjective anti-union motivation is necessary to support the charge. However, if the destructive impact on employee organizational rights is comparatively slight, the employer may defend against the charge by introducing evidence showing that the conduct was motivated by business or other legitimate considerations. If the employer can produce such information, the aggrieved party may, in turn, submit evidence showing a substantial anti-union motivation. The showing of a substantial anti-union motivation is sufficient to support the charge, even if some legal motivating factors are present. Thus, substantial evidence from which the Board can infer the

motivation of the employer at the time of the discharge may be essential to the defense to or proof of the charge." (footnotes omitted) Note, *The Labor Statute of Limitations: The Bryan Manufacturing Co. Case Revisited*, 55 B.U.L.Rev. 598, 618 (1975).

If, but only if, the employer can show the union's majority is truly in doubt, the situation confronted is at the opposite end of the spectrum from the situation where the employer's conduct is inherently destructive of employee rights. It follows that not only is proof of anti-union motivation then unnecessary, but it is immaterial to the charge. We emphasize, however, that the employer must have ample evidence in support of his doubt before we can condone this assumption of the cause of employee democracy.

**25.** Christensen and Svanoe, *Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality*, 77 Yale L.J. 1269 (1968); 55 B.U.L.Rev., *supra* note 24, at 623; Seger, *The Majority Status of Incumbent Bargaining Representatives*, 47 Tul. L.Rev. 961, 981–87 (1973).

Though knowledge does entail ascertaining what is in the employer's mind, the inquiry

of the reasonable doubt defense eliminates uncertainty for the employer and reduces the risk of an erroneous determination if an unfair practice charge is filed. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

▇▇▇ When motivation is an issue, evidence of a prior unfair practice is admissible.[26] Subjective motivation is not, however, an element of the reasonable doubt defense. Consequently, the evidence was inadmissible, and the alleged prior unfair practice did not constitute an objective ground for challenging the Union's bargaining status.[27]

▇▇▇ The employers argue that placing on them the burden of refuting the presumption of majority status is unfair because the Union has superior access to the information regarding Union support. The effect, respondents conclude, is that they are forced to assume the risk of erroneous determinations. We agree: the employer usually does have inferior access to the relevant information and may risk further penalty in garnering additional data.[28] Yet we think the burden is fair.[29]

In refusing to bargain because of an alleged decline in union adherents, the employer is acting as vicarious champion of its employees, a role no one has asked it to assume.[30] The employees were free to petition for decertification; here, they never did. Respondents were also free to petition for an election, the preferred method for resolving majority disputes, but neither did until much later. When the employer chooses to unilaterally disrupt an established bargaining relationship without an election, the threat to industrial peace must

ceases there. Inferences are unnecessary. If the total of the employer's knowledge and ignorance is sufficient to support a reasonable doubt, the defense is established. On the other hand, when the Act prohibits conduct for an unlawful purpose, the Board must also infer why the employer acted. Theoretically, the good faith defense could require another strictly subjective finding based on inference, i. e., whether the employer actually believed certain facts which support the asserted reasonable doubt. But the Board has applied an objective test: the doubt is unreasonable if premised on unreliable evidence regardless of the employer's subjective belief. We think the converse is also true. We have found no case holding that an employer could not assert a reasonably based doubt because, though aware of the supporting facts when bargaining was refused, he unreasonably chose to disbelieve them. Thus, we think good faith is directed only to timing: the reasonable grounds must be known at the time the refusal occurs. Motivation and subjective belief are irrelevant except as they may shed light on the sufficiency of the evidence. *See NLRB v. Vegas Vic, Inc.,* 546 F.2d at 829.

26. *United Packinghouse, Food & Allied Workers International Union v. NLRB,* 135 U.S.App. D.C. 111, 116 n. 8, 416 F.2d 1126, 1131 n. 8 (1969), *cert. denied,* 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *NLRB v. Patterson Mendhaden Corp.,* 389 F.2d 701, 702–03 (5th Cir. 1968); *NLRB v. Stafford Trucking, Inc.,* 371 F.2d 244, 246–47 (7th Cir. 1966); *Paramount Cap Mfg. Co. v. NLRB,* 260 F.2d 109 (8th Cir. 1958).

27. We appreciate this requires the employer to disregard evidence he may know to be true. But this consequence of the *Bryan Manufacturing* rule is equally applicable when the employer determines he can disprove the union's majority status or takes any other action in reliance on inadmissible evidence.

28. *NLRB v. Gissel Packing Co.,* 395 U.S. at 609–10, 89 S.Ct. 1918, 23 L.Ed.2d 547; *Automated Business System v. NLRB,* 497 F.2d 262, 270–71 (6th Cir. 1974) (quoting *Stoner Rubber Co.,* 123 NLRB 1440); *see NLRB v. Fulfmont Hotel Co.,* 362 F.2d 588, 590–91 (5th Cir. 1966). *But see NLRB v. H. P. Wasson & Co.,* 422 F.2d 558 (7th Cir. 1970) (employee poll not coercive).

29. One factor contributing to our conclusion is that an objective construction of the reasonable doubt defense, as we have adopted herein, lightens the evidentiary burden imposed on an employer who is charged with an unfair labor practice.

30. "The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it." *Brooks v. NLRB,* 348 U.S. at 103, 75 S.Ct. at 181. *See NLRB v. Lee Office Equipment,* 572 F.2d at 707.

be counterbalanced by good cause.[31] When the employer has doubts, the goal of the Act would be better served by filing an election petition.[32] Requiring the employer to show that his refusal to bargain was reasonable fairly allocates the burdens and concomitant risks.[33]

Respondents also argue the *Bryan Manufacturing* rule makes this an irrebuttable presumption. The argument confuses the presumption with its factual predicate. § 10(b) does preclude respondents from showing the Union was in the minority when the Union was first recognized, but the presumption pertains to the Union's majority at the time the employer refused to bargain. The presumption may be rebutted; the only fact conclusively established is the fact that triggers the presumption.

Respondents' reliance on *NLRB v. Heyman*, 541 F.2d 796 (9th Cir. 1976) is misplaced. There the contract had been invalidated by a prior judicial decree; therefore, the presumption was inapplicable.

"Majority representation is not the issue in this case; but what was and is the issue is the effect of the district court rescission on the presumption of validity utilized by the Board."

*Id.* at 800.

*See Pioneer Inn Associates v. NLRB*, 578 F.2d 835 (9th Cir. 1978). The Board cannot ignore a judicial decree; it must ignore evidence which the Supreme Court has held to be inadmissible.

## WITHDRAWAL FROM THE UNIT

The next issue is whether the presumption survives dissolution of the multi-employer unit. Three interests embraced by the Act shape our decision:

1. employee free choice;
2. stability in bargaining; and
3. the deference we owe to Board expertise.

*See Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1140 (9th Cir. 1974), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). We conclude the Board did not abuse its discretion in balancing free choice and stability when it determined that, in this instance, freedom of choice must subserve the goal of industrial peace. *See id.* at 1138.

■ Multi-employer units are formed by mutual consent of union and employer. But their power is limited: voluntary recognition of a union which does not enjoy majority support in the single employer unit is an unfair labor practice. *See NLRB v. Local 210, International Brotherhood of Teamsters, etc.*, 330 F.2d 46 (2d Cir. 1964). Nevertheless, either party may withdraw from the multi-employer unit without ascertaining the effect on union majority in the respective units.

■ Relying on Member Walther's dissenting opinions, respondents assert the presumption is inapplicable once the employer withdraws from the multi-employer unit.[34] Since recognition was based on majority support within the larger unit, respondents argue, the factual predicate of the presumption, prior majority status, is inapposite when applied to the single employer unit. Respondents point out: no election was ever held; the Union was not recognized until the employers joined the Association; no separate contracts were signed; and withdrawal from the larger unit was timely. Under these facts, respon-

---

**31.** *Retired Persons Pharmacy v. NLRB*, 519 F.2d at 490 (balance between industrial peace and free choice weighed differently when employer is asserting rights of its employees).

**32.** Although we recognize that an election petition may cause delay and create other practical problems, the election process in still preferable. *NLRB v. Gallaro*, 419 F.2d 97, 101 (2d Cir. 1969); *see Brooks v. NLRB*, 348 U.S. at 104 & n. 18, 75 S.Ct. 176.

**33.** *Retired Persons Pharmacy v. NLRB*, 519 F.2d at 491; *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1139 (7th Cir. 1974), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974) (burden on employer "not severe"); *See NLRB v. Gallaro*, 419 F.2d at 101.

**34.** In the alternative, respondents contend withdrawal provides sufficient reason for doubting the Union's majority. We find the arguments indistinguishable and discuss only the first.

dents conclude, the presumption is derivative, supported only by policy far-removed from actual fact; therefore, it should not be weighed heavily, if at all.

The reasoning of the Board majority persuades us that respondents' argument must fail. Respondents' argument misconstrues the presumption in two ways. First, the presumption is rooted in the employer's appraisal of union strength among its own employees. Second, the basis of the presumption is primarily policy, not probability; it is a vehicle for maintaining industrial peace.

In many instances, the presumption originates with an election among the employees of several employers. When the bargaining representative is chosen in a multi-employer-unit election, the factual premise is derivative: majority status in the single employer unit is inferred from the union's victory in the multi-employer election. Although the inference is reasonable,[35] some reviewing courts have deemed it too speculative to support the presumption after the larger unit has dissolved.[36] Here, however, no election was held; the Union was voluntarily recognized.

When respondents joined the Association and recognized the Union, they implicitly declared their employees favored the Union. Thus, majority status can be directly inferred from the employer's own conduct; the presumption is not derived from the larger unit's majority, but originates with the employer's implicit declaration of a majority in the single employer unit. Moreover, the original factual inference is convincing: employers normally will not knowingly violate the law and union fraud is rare. Continued membership in the larger unit does nothing to negate this principle even though the larger unit becomes the appropriate one for bargaining.[37] The original presumption subsists: withdrawal from the unit simply entails a reversion to the original unit, a unit previously determined from the employer's own conduct to favor union representation.

A secondary consideration supporting the presumption's continued vitality is its grounding in policy. By preserving the status quo, the presumption ensures the Act's most valued objective: industrial peace.[38] Respondents' assertion—that the inference of majority support based on voluntary recognition a decade before is too attenuated to survive withdrawal from the Association[39]—assumes the presumption is merely an evidential tool based wholly on probabili-

**35.** *See Zim's Foodliner, Inc. v. NLRB*, 495 F.2d at 1136–42; *NLRB v. Armato*, 199 F.2d 800 (7th Cir. 1952).

**36.** In *NLRB v. Richard W. Kaase Co.*, 346 F.2d 24 (6th Cir. 1965), the Sixth Circuit did hold that withdrawal from a multi-employer unit vitiated the presumption despite the existence of a separate contract between the union and Kaase. But in that case the union's position as exclusive bargaining representative of the Kaase employees originated with an election in the multi-employer unit. No evidence showed the Kaase employees themselves ever favored the union; thus, the fact of majority status in the single-employer unit had never been established, as it had been here by the employer's voluntary recognition. There were other distinguishing facts. The union, the court noted, controlled Kaase employees through a union security clause and represented them in a high-handed manner. Kaase had been sold to new owners, and the size of its work force had been halved. Also the issue arose in the context of conflicting representational claims and blatant

unfair labor practices by Kaase and the rival union.

The court specified its holding was limited to the unusual circumstances presented. Though we express no view on the holding, we distinguish it on these bases.

*See also NLRB v. Downtown Bakery Corp.*, 330 F.2d 921 (6th Cir. 1964); *Ref-Chem Co. v. NLRB*, 418 F.2d 127 (5th Cir. 1969).

**37.** There was no evidence that prior to withdrawal, respondents doubted the Union majority but continued to recognize the Union because of their membership in the larger unit which was then the appropriate unit for bargaining.

**38.** *See Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

**39.** As a factual matter, this assertion presents a close question. The sentiments of the present employees have never been tested. On the other hand, they have not objected to the Union's representation by filing a decertification petition. See The Employer's Evidence, *infra*.

ty. The presumption, however, also subsists for policy reasons.

Presumptions often function to further social, economic, or other policies, distinct from the fact presumed. C. McCormick, *Law of Evidence* § 343 (Cleary ed. 1972). *But see Ref-Chem Co. v. NLRB*, 418 F.2d 127, 128–29 (5th Cir. 1969). In assorted contexts, the Board has used presumptions to stabilize labor-management relations. Inasmuch as primary responsibility for reconciling the inherent conflict between employee rights and bargaining stability has been entrusted to the Board, we determine only whether adoption of the presumption strikes a fair balance.[40]

In the single-employer context, the balance struck by the Board has been approved by the Supreme Court even though majority support was not demonstrable. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).[41] As stated previously, the presumption here, though perhaps distinguishable, stems from the single employer unit. Other circuits have approved Board presumptions in analogous circumstances when majority support was not readily deducible. *E. g., Zim's Foodliner, Inc. v. NLRB*, 495 F.2d at 1136–38. *See also Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The Board may have concluded that the potential for abuse inherent in the employer's right to unilaterally withdraw from the Association justifies the incursion on employee freedom.[42] If an employer could routinely negate the presumption of union majority status by withdrawing from a bargaining association, unions might refuse to consent to multiple party bargaining and this effective device for promoting industry-wide peace would be lost. Since industrial peace is no less desirable in multi-employer units and the election alternative is available to both employer and employee, we think the Board has not abused its discretion.

## THE EMPLOYERS' EVIDENCE

Both the Administrative Law Judge and the Board found respondents had failed to introduce evidence sufficient to support a reasonable doubt. The credibility determinations made by the Administrative Law Judge and approved by the Board were fully warranted; in fact, conflicts in the evidence were rare, and virtually all of the testimony was credited. We pay great deference to the inferences drawn by the Board from the credited testimony because Board members' expertise and experience in labor-management relations is an invaluable asset to the task.[43] Nonetheless, derivative inferences which are tenuous, irrational, or unwarranted do not constitute substantial evidence and will be overturned on appeal. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977).

Seven factors relied upon by respondents are discussed below. They are:
1. employee discontent,
2. turnover,
3. union inactivity,

---

**40.** *See NLRB v. Local Union No. 13, International Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL–CIO*, 434 U.S. 335, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *cf. Daisy's Originals, Inc. of Miami v. NLRB*, 468 F.2d at 503 (responsibility for balancing employee freedom against need to remedy effects of employer misconduct is Board's, subject to judicial review).

**41.** In *Burns* a successor employer hired 27 employees from the previous unit and added 15 new employees. Less than four months before, an election in the prior unit had been held and a bargaining representative certified. The court held the one-year irrebuttable presumption applied despite the change in employers and make-up of the unit.

**42.** In *Nevada Lodge*, withdrawal from the Association was motivated, in part, by the belief that pockets of Union strength within the Association might sustain the Union's overall majority. Under respondents' view, the employer could threaten withdrawal to enhance its bargaining power or could disrupt an established bargaining relation to undermine union authority.

**43.** *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977); *see NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1369 (9th Cir. 1969).

4. low membership,
5. financial difficulties of the union,
6. bargaining history, and
7. admissions.

After analyzing each individually, their combined effect is considered. We note at the outset that in most decisions upholding the reasonable doubt defense the employer could point to at least one factor which was clearly referable to a decline in union support.[44] In many instances, this factor alone did not constitute sufficient evidence to justify the refusal to bargain, but did provide an unequivocal tie between the other evidence and the ultimate fact—whether union support had dwindled to a minority.[45]

All of the factors established by respondents are equivocal. They may represent a loss of union support, yet may be explained by other reasons. For example, low membership may show the union is losing support as bargaining representative, or it may simply indicate unwillingness to participate in union activities. The Board has consistently held that no single equivocal factor is sufficient to sustain the good faith doubt defense, but that each will be accorded some weight when the total effect of the evidence is assessed.

When the Board looks to the cumulative force of the evidence, the factors are reconsidered and weighed against the force of the presumption. If unexplained, the cumulative inferential weight of these equivocal factors might suffice to establish that the refusal to bargain was reasonable.[46] Derivative inferences of union minority status cannot be disregarded upon mere speculation; to ignore their cumulative effect would be irrational and unwarranted. We do not say the Board has deviated from its stated policy here, but merely outline the proper steps to ensure they are followed.

█ In reviewing the facts, we are guided by several evidentiary considerations:

1. Evidence manifesting declining union support is more pertinent than evidence showing union support is low.
2. In gauging union support, the employer is often without direct evidence of minority status, and therefore he may properly rely on reasonable inferences from the available information. But that does not justify wishful speculation on the employer's part.
3. When information signifying lack of union support would be readily available if union support had eroded, an insubstantial showing by the employer may be convincing proof the union has majority support.
4. When the employer has consistently demonstrated impartiality regarding employee representation, his decision may be some evidence that the grounds relied on are reasonable.

With these thoughts in mind, we examine the particular facts before us.

1. Employee Discontent

Reports of employee complaints about the Union were one reason asserted by respondents for deciding the Union was in the minority. Much of the evidence to show employee dissatisfaction with the Union was speculative, conjectural, and vague. Often it was hearsay or based on management's evaluation of employee sentiment. Its probative weight is accordingly slight.[47]

---

44. *E. g., National Cash Register Co. v. NLRB,* 494 F.2d 189 (8th Cir. 1974) (decertification petition); *NLRB v. Gallaro,* 419 F.2d 97 (2d Cir. 1969) (7 of 10 employees petitioned for decertification); *Lodges 1746 & 743, etc. v. NLRB,* 416 F.2d 809 (D.C.Cir.1969) (union admission that majority support lacking). *See also NLRB v. Cornell of California, Inc.,* 577 F.2d 513 (9th Cir. 1978) (reliance on "identifiable acts" of majority preferred).

45. *See, e. g., Dalewood Rehabilitation Hospital, Inc. v. NLRB,* 566 F.2d 77, 80 (9th Cir. 1977).

46. But we have found no cases in which the reasonable doubt defense was sustained based solely on equivocal evidence. Common to each case was the presence of at least one factor clearly referable to a lack of majority support.

47. *See Terrell Machine Co. v. NLRB,* 427 F.2d 1088 (4th Cir. 1970), (reliance on vague, unidentified reports of employee discontent un-

■ The dissatisfaction testified to here did not, for the most part, amount to repudiation.[48] Many an employee complains of his job without ever contemplating quitting, and remarks to management may be affected by a desire to curry the employer's favor.[49] Absent other activity which would confirm that the reported complaints were expressions of repudiation, the two cannot be equated.[50] Here, the complaints were not vociferous, a petition for decertification had not been filed, and no organized opposition to the Union had formed.[51] Furthermore, the number of discontented employees was insubstantial.[52]

In summary, the evidence was unreliable and the inference from it tenuous. Consequently, we afford it almost no weight.[53] The absence of more concrete evidence of employee discontent, particularly the filing of a decertification petition, is actually more persuasive.

### 2. Turnover

Respondents assert there is no basis for concluding that the present complement of employees shares the same attitude towards union representation as held by their predecessors a decade before. The annual turnover was consistently high for both employers. Thus, the work force at the time of the employers' refusal was completely different.[54]

■ High turnover, by itself, is insufficient to justify a refusal to bargain except when caused by employee discontent with the union.[55] The Board has adopted a presumption that new employees support the union in the same ratio as their predecessors.[56] Despite the legitimacy of this presumption, high turnover can be considered when other factors show declining union adherency.[57]

---

warranted); *Allied Industrial Workers, AFL–CIO Local Union No. 289 v. NLRB*, 155 U.S. App.D.C. 112, 125–126, 476 F.2d 868, 881–82 (D.C.Cir.1973).

48. The evidence in *Nevada Lodge* was stronger; some of it could be characterized as a repudiation of the Union's representation. An overly-stringent, technical definition of what statements constitute repudiation serves no purpose. The evidence must be evaluated with common sense and an appreciation for its context. We doubt employees often explicitly declare, "I repudiate the union."

49. Some of the complaining employees were dues-paying Union members or subsequently joined the Union.

50. *See Retired Persons Pharmacy v. NLRB*, 519 F.2d 488, 490 (2d Cir. 1975); *cf. NLRB v. Frick Co.*, 423 F.2d 1327, 1333–34 (3d Cir. 1970) (strikers return to work equivocal; Board to determine if, under all the circumstances, return indicates abandonment of union).

51. *See Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1036–37 (8th Cir. 1976) (anti-union committee deemed objective evidence supporting employer's reasonable doubt).

52. *See NLRB v. A. W. Thompson*, 525 F.2d 870, 873 (5th Cir. 1976), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976); *NLRB v. Little Rock Downtowner, Inc.*, 414 F.2d 1084, 1092 (8th Cir. 1969).

53. *See* Seger, *supra* note 25, at 992–93.

54. *See NLRB v. King Radio Corp.*, 510 F.2d 1154 (10th Cir. 1975), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), where the number of employees had risen to 876 from 343, and in a five-year period since certification, 4214 persons had been hired and 3423 terminated. The court held the turnover did not afford reasonable grounds for doubting the union's majority. *Id.* at 1156.

55. *NLRB v. Little Rock Downtowner, Inc.*, 414 F.2d at 1091. This is particularly true when high turnover is prevalent in the industry. *NLRB v. A. W. Thompson, Inc.*, 525 F.2d at 872; *NLRB v. Hondo Drilling Co., N.S.L.*, 525 F.2d 864, 868–69 (5th Cir. 1976), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976); *see NLRB v. Hondo Drilling Co.*, 428 F.2d 943 (5th Cir. 1970).

56. This presumption can be rebutted, for example, by showing a decline in the ratio of check-offs to pro-union votes. *See Ingress-Plastene, Inc. v. NLRB*, 430 F.2d 542, 546 n.6 (7th Cir. 1970).

57. *Teamsters Local Union 769 v. NLRB*, 174 U.S.App.D.C. 310, 315, 532 F.2d 1385, 1390 (1976) (dictum); *Star Mfg. Co. Division of Star Forge, Inc. v. NLRB*, 536 F.2d 1192, 1195–96 (7th Cir. 1976).

### 3. Union Inactivity

In the years immediately preceding respondents' refusal to bargain, the Union had not processed any grievances. The significance of this fact is questionable, since there was no testimony showing any grievances were warranted.[58] When, as here, the union and the employer have established an amicable relationship over several years, contract violations may be the exception. Witnesses for both employers testified they abided by the collective bargaining agreement and were unaware of any contract violations.

▮▮ There was, however, other evidence of Union inactivity. Union agents inspected the business premises infrequently. No employees attended a meeting called by the Union[59] in the spring of 1974. Yet there is no evidence the Union failed to fulfill its responsibilities under the contract or breached its duty of fair representation.[60] Union inactivity is an objective ground which may contribute to an employer's conclusion that union support is lacking,[61] but the showing here was de minimis.

### 4. Low Membership

Among bar and culinary employees in the Tahoe basin, Union membership was relatively low. For several reasons, this evidence is only marginally relevant.[62] Low membership was never tied to respondents' employees. Also, employees may favor union representation, but choose not to join, *NLRB v. Vegas Vic, Inc.*, 546 F.2d 828 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1978); this disparity is emphasized in a right-to-work state, such as Nevada. *See Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir. 1970), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

### 5. Financial Difficulties of the Union

During 1974, the Union was placed in trusteeship, and a campaign to organize more workers was launched. This says little about support within the subject units. The Union was solvent. Its financial problems may have stemmed from overextension without sufficient financial support. Employees who desire representation may be unwilling to pay for it. The organizational campaign only shows a desire for more members, either within the units represented or from units as yet unrepresented. The record shows the Union undertook the campaign because higher membership would help the Union at the bargaining table; thus, the expanded organizing efforts were proper Union activity on behalf of the employees it then represented.

### 6. Bargaining History

Relations between the Union and employer were amicable for many years. By

---

58. When Respondent Nevada Lodge decided to enforce the company's anti-nepotism policy, the Union effected the rehire of five of the seven employees discharged. When employees complained that their ten-minute breaks and half-hour lunches were not being provided, the Union filed a grievance with the Nevada Labor Commission. The grievance was subsequently resolved.

After the refusal to bargain, two written grievances were filed by the Union. This evidence, of course, is irrelevant.

59. This was a meeting of all employees in the Lake Tahoe area. When the Union called a meeting to discuss matters affecting Nevada Lodge employees, fifteen or eighteen employees attended (see n.16, *supra*). *Cf. NLRB v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11 (4th Cir. 1971) (only 2 of 140 employees attended union meetings and only 2 plant visits by union: good faith doubt found to exist, but

finding premised on filing of petition for decertification).

60. The Union negotiated successive bargaining agreements with the Association; there was no evidence the Union had ever been charged with an unfair labor practice by respondents or any employees.

61. *E. g., Ingress-Plastene v. NLRB*, 430 F.2d 542 (7th Cir. 1970) (union processed none of 32 grievances filed, failed to recommend promotions or designate employees for super-seniority, and abdicated its responsibilities regarding safety in the workshop).

62. The obverse is also true: high membership may be an unreliable barometer of pro-union sentiment. *See Teamsters Local Union 769 v. NLRB*, 532 F.2d at 1390.

deemphasizing subjective motivation, we concomitantly discount the importance of this factor. Seger, *supra* note 25, at 994. Nonetheless, it may show the employer's decision was impartial and, by inference, reasonable.

The history of employee-union ties may be more significant. There was no evidence here of employee-led challenges to the Union's representation or of abdication by the Union.

### 7. Admissions

Neither the Union nor the employer had made damaging statements about their assessments of Union support.[63] In *Nevada Lodge*, respondent's attorney was "to use any necessary method to get us disassociated from the union." This fact may be helpful in evaluating credibility, and it does imply subjective bad faith. Since the evidence was generally credited and this is not the unusual case where subjective motivation is an important factor, we find this evidence insignificant.[64]

### 8. Cumulative Effect of the Evidence

None of the evidence is wholly referable to a decline in Union support within the relevant units. Most of the evidence indicates the Union had equivocal support in the Lake Tahoe area. Some of the evidence is subjective; the inferences of loss of Union support are ambiguous. Before unilaterally disrupting the bargaining relationship, an employer must obtain more reliable evidence of lost support.

We therefore affirm the Board's determination that respondents violated sections 8(a)(1) and (5) of the Act by refusing to bargain with the Union. After

considering the record as a whole, we also affirm the Board's finding that respondent Nevada Lodge independently violated § 8(a)(1) by unilaterally changing working conditions to induce its employees to abandon the Union.

The Board's Orders are enforced.

---

**63.** The testimony of Alfred Staff, President of the Union, from July 1973 to June 7, 1974, was material only to the question of the Union's actual majority; respondents were apparently unaware of the facts testified to by Staff when they refused to bargain.

**64.** Another ground relied on by respondents was that the collective bargaining agreement did not contain a clause authorizing dues checkoffs or a union security clause. This only

confirms the Union lacked bargaining power with the employers, a fact the Union admitted.

Respondents also contend the reduction in unit size consequent on withdrawal from the Association should be considered. Reduction in unit size is not sufficient to justify a refusal to bargain, *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d at 1140, and in light of the presumption's relation to the single employer unit discussed previously, this fact does not contradict the inference of majority support.