# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2017         Decided March 7, 2017

No. 15–1412

SCOMAS OF SAUSALITO, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITE HERE, LOCAL 2850,
INTERVENOR

———

Consolidated with 15-1476

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Diane Aqui* argued the cause and filed briefs for the petitioner.

*Heather S. Beard*, Attorney, National Labor Relations Board, argued the cause for the respondent. *Richard F. Griffin*, *Jr.*, General Counsel, *Jennifer Abruzzo*, Deputy General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel,

and *Jill A. Griffin*, Supervisory Attorney, were with her on brief.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Scomas of Sausalito (Scomas) operates a seafood restaurant in northern California.[1] From 2000 to 2013, it recognized UNITE HERE! Local 2850 (Union) as the exclusive collective-bargaining representative for the restaurant's bartenders, bussers, cooks, dishwashers, hostesses and servers. In 2013, 29 of the bargaining unit's 54 employees signed a decertification petition asking Scomas to "withdraw recognition from [the Union] immediately" if the petitioners "make up 50% or more of the bargaining unit." Joint Appendix (JA) 131-32. One of the employees gave the petition to Scomas. Another filed it with the National Labor Relations Board (NLRB or Board) because the petition asked the Board to conduct a decertification election if the petitioners "make up 30% or more (and less than 50%) of the bargaining unit." *Id*. Without telling Scomas, the Union persuaded six of the petitioners to revoke their signatures. Two days later, still unaware that six employees had a change of heart, Scomas withdrew recognition from the Union. The remaining petitioners, apparently believing they were free of the Union, withdrew the decertification petition from the Board. Only

---

[1] Parts of the record refer to the restaurant as "Scoma's." The company's briefs call it "Scomas," however, so we use that formulation.

then did the Union spring back into action: it filed an unfair labor practice (ULP) charge with the Board, claiming that Scomas had violated the National Labor Relations Act (Act), 29 U.S.C. §§ 151 *et seq.*, by withdrawing recognition from the Union when it in fact had majority support.

The Board sided with the Union and ordered Scomas to recognize and bargain with it.  The bargaining order includes a "bar to raising a question concerning the Union's continuing majority status for a reasonable time," on the theory that such delay is "necessary" to "dissipate[]" the "taint" of Scomas's violation.  362 NLRB No. 174, at 7 (Aug. 21, 2015).

Scomas petitions for review of the Board's order.  The Board cross-petitions for enforcement.  We grant the former petition and deny the latter.  Under Board law, "an employer with objective evidence that the union has lost majority support—for example, a petition signed by a majority of the employees in the bargaining unit—withdraws recognition at its peril" and can stave off a ULP charge only by establishing that "the union had, in fact, lost majority support at the time the employer withdrew recognition." *Levitz Furniture Co.*, 333 NLRB 717, 725 (2001).  Applying *Levitz*, the Board concluded that the six revocation signatures prevented Scomas from proving the Union lacked majority support at the time of withdrawal.  Although we do not disturb that conclusion, the Board's remedy does not follow from it.  A bargaining order is an extraordinary remedy that, on these facts, is out of keeping with the Act's purposes.  It rewards the Union for sitting on its hands.  It punishes Scomas for acting unwarily but in good faith.  And it "give[s] no credence whatsoever to employee free choice," *Skyline Distribs. v. NLRB*, 99 F.3d 403, 411 (D.C. Cir. 1996) (internal quotation omitted), unduly delaying an election to determine majority status.  We

therefore vacate the bargaining order and remand to the Board for further proceedings.

## I. BACKGROUND

Before recounting why and how Scomas withdrew recognition from the Union, we summarize the legal context of its actions.

### A. THE LAW OF WITHDRAWAL

"The Act's twin pillars" are "freedom of choice and majority rule in employee selection of representatives." *Conair Corp. v. NLRB*, 721 F.2d 1355, 1381 (D.C. Cir. 1983). Section 1 declares a policy of "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. Under section 9, a "majority of the employees in a unit appropriate for" collective bargaining selects an exclusive bargaining representative. 29 U.S.C. § 159(a). Once an employee unit has selected a union to represent it, the law presumes the union enjoys "continuing majority support." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 794 (1990). The presumption fosters "industrial peace" and "stability in collective-bargaining relationships, without impairing the free choice of employees." *Id.* (internal quotation omitted).

The presumption, however, is only that: except during certain periods not at issue here, employees are not bound to be represented by a union they no longer want. *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996) (presumption is "rebuttable" except for one year following union's initial certification and when any collective-bargaining agreement is

in effect for up to three years). Employees have two ways of severing union representation. First, if 30 per cent of the unit employees agree, they can obtain an election by filing a decertification petition with the Board, which decides majority status based on the election. *See* 29 U.S.C. § 159(c)(1)(A)(ii); NLRB Casehandling Manual, Pt. 2, Representation Proceedings § 11023.1 (Jan. 2017). Or, second, the employees can go directly to the employer, presenting it with a petition or other evidence that the union has lost majority support. *See, e.g.*, *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321, 324, 326 (D.C. Cir. 2015); *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 730 (D.C. Cir. 2000).

When presented with evidence that the union no longer has majority backing, the employer "has three options: to request a formal, Board-supervised election, to withdraw recognition from the union and refuse to bargain, or to conduct an internal poll of employee support for the union." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 361 (1998). Only the first two options are relevant here. If the employer opts for an election, it must file a petition with the Board. NLRB Casehandling Manual, *supra*, § 11042; *cf. Parkwood Dev. Ctr., Inc. v. NLRB*, 521 F.3d 404, 406 & n.1 (D.C. Cir. 2008). Election is the "preferred" method of determining majority status, *Levitz*, 333 NLRB at 723, 725-27, because an employer's unilateral withdrawal of recognition is more subjective and less precise, *NLRB v. Cornerstone Builders, Inc.*, 963 F.2d 1075, 1078 (8th Cir. 1992). *Levitz* bears out this preference. Under *Levitz*, "an employer may rebut the continuing presumption of an incumbent union's majority status, and unilaterally withdraw recognition, only on a showing that the union has, in fact, lost the support of a majority of the employees in the bargaining unit." 333 NLRB at 725. As a corollary, the employer acts "at its peril" when it withdraws recognition, even when presented with "a petition

signed by a majority of the employees in the bargaining unit." *Id*. By contrast, an employer obtains an election under a "more lenient standard," "by demonstrating reasonable good-faith uncertainty as to [an] incumbent union['s] continued majority status." *Id*. at 723 (emphasis omitted).

## B. SCOMAS'S WITHDRAWAL

The Union is the exclusive collective-bargaining representative of Scomas's service staff. From 2000 until September 2012, Scomas operated under a series of collective-bargaining agreements with the Union. For more than one year after the last agreement expired in 2012, the Union did not request bargaining. Also, according to employee Georgina Canche, the Union for years held no meetings and gave its members no information, despite collecting dues all the while.

"[F]rustrated," Canche researched decertification procedures online and obtained a standard-form decertification petition. JA 58. Between September 26 and October 28, 2013, she collected 29 signatures from the 54 employees in the bargaining unit. A fellow employee delivered the petition to Roland Gotti, Scomas's general manager, on October 28. The next day, Canche filed the petition with the Board. The petition asked Scomas to "withdraw recognition from [the Union] immediately" if the petitioners "make up 50% or more of the bargaining unit." JA 131-32. In the alternative, it asked the Board to conduct a decertification election if the petitioners "make up 30% or more (and less than 50%) of the bargaining unit." *Id*.

Lian Alan, the Union's lead organizer, heard about the petition before it was filed. He emailed Gotti late in the evening on October 28, 2013, to "request bargaining dates to begin the negotiations for a collective bargaining agreement."

JA 53. The email said nothing about the petition, however, or that Alan intended to persuade the petitioners to revoke their signatures.

The following afternoon, October 29, 2013, Alan spoke with several of the petitioners outside Scomas's restaurant during a shift change. The evidence is in conflict about what he said. According to Alan, he told them "it was possible that [Scomas] could withdraw recognition from the Union," JA 22, in which case "all of their benefits, pay, and wages would be determined by" Scomas, JA 146. According to the employees—whose recollections differed about the exact words—Alan said that, if the Union were decertified, Scomas could take away their benefits, fire them or report them to immigration authorities. By all accounts, Alan told them that if they wanted to withdraw their names from the decertification petition, they could do so. He presented them with a form stating: "If I signed a petition to decertify or get rid of the Union, I hereby revoke my signature. I do wish to continue being represented by [the Union] for the purposes of collective bargaining." JA 54. Six of the employees who had earlier signed the decertification petition then signed the revocation form.[2] Alan did not tell Scomas about the revocation.

In the meantime, Gotti compared the 29 signatures on the decertification petition with the signatures on the employees' payroll records. Because the signatures matched and represented a majority of the unit employees, Scomas withdrew recognition from the Union as the petition requested. Specifically, on October 31, 2013, Scomas told Alan via fax, email and certified mail that it had "received a petition from the

---

[2] A seventh employee signed the revocation form but her signature was not counted because she had not signed the decertification petition.

majority of [its] employees stating they do not want to be represented by [the Union] any longer." JA 65. Scomas said that, in light of the petition, it was "withdrawing recognition" and could not grant Alan's October 28 request for bargaining. *Id*. Scomas sent the message without knowing that Alan had two days earlier obtained revocation signatures from six petitioners. On receiving the message, Alan still did not tell Scomas about the revocation. Indeed, as far as the record shows, he did not respond at all.

On November 6, 2013, Canche withdrew the decertification petition from the Board, presumably because she and the other petitioners thought Scomas had mooted any election by withdrawing recognition from the Union. On November 12, the Union filed a ULP charge against Scomas, claiming the Union had majority status when Scomas withdrew recognition on October 31.

## C. THE BOARD PROCEEDINGS AND BARGAINING ORDER

An administrative law judge (ALJ) conducted a hearing at which Gotti, Alan and several unit employees testified. Afterward, in a published order, the ALJ rejected Scomas's contention that "the Union had a duty to inform [Scomas] that it had gathered evidence of support for the Union from decertification signers." 362 NLRB No. 174, at 6. The ALJ observed that *Levitz* required Scomas to establish that the Union "actually" lacked majority support when Scomas withdrew recognition. *Id*. at 3. Crediting Alan's testimony over that of the revocation signatories, the ALJ found that "the revocation signatures were not the subject of misrepresentation or coercion and are valid revocations." *Id*. at 6. In light of that finding, the ALJ concluded that Scomas had violated

section 8(a)(5) and (1) of the Act by withdrawing recognition when the Union enjoyed majority support.[3]

To remedy the violation, the ALJ ordered Scomas to (*inter alia*) "recognize and bargain with the Union for a reasonable period of time." 362 NLRB No. 174, at 6. Consistent with "time-honored Board practice," *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1122 (D.C. Cir. 1994), the order "bar[s]" Scomas and its employees from "raising a question concerning the Union's continuing majority status" during the required bargaining period, 362 NLRB No. 174, at 7.

In support of the bargaining order, the ALJ "quoted in full and adopted" the Board's reasoning in *Anderson Lumber Co.*, 360 NLRB 538 (2014), *enforced sub nom.*, *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321 (D.C. Cir. 2015), a case in which the Board imposed the same remedy. 362 NLRB No. 174, at 7. As relevant here, the ALJ quoted *Anderson Lumber* for the following three propositions, correlating to a three-factor balancing test mandated by our case law. *See, e.g.*, *Vincent Indus. Plastics*, 209 F.3d at 738. *First*, in the ALJ's view, the order "vindicates the Section 7 rights of the unit employees who were denied the benefits of collective bargaining by

---

[3] Section 8(a)(5) makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees[.]" 29 U.S.C. § 158(a)(5). Section 8(a)(1) makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7, including the right "to bargain collectively through representatives of their own choosing." *Id.* §§ 157, 158(a)(1). Because of the overlap in provisions, "an employer who violates section 8(a)(5) also, derivatively, violates section 8(a)(1)." *Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004).

[Scomas's] withdrawal of recognition" and "does not unduly prejudice" employees who oppose the Union, especially because their opposition "may be at least in part the product of" Scomas's conduct. 362 NLRB No. 174, at 7 (quoting *Anderson Lumber*, 360 NLRB at 538). *Second*, according to the ALJ, the order "foster[s] meaningful collective bargaining and industrial peace" by removing Scomas's "incentive to delay bargaining in the hope of further discouraging support for the Union" and by ensuring the Union does not feel "pressured . . . to achieve immediate results at the bargaining table." *Id.* (quoting *Anderson Lumber*, 360 NLRB at 538). *Third*, in the ALJ's telling, an alternative remedy "would be inadequate . . . because it would permit another challenge to the Union's majority status before the taint of [Scomas's] unlawful withdrawal of recognition has dissipated, and before the employees have had a reasonable time to regroup and bargain through" the Union. *Id.* (quoting *Anderson Lumber*, 360 NLRB at 538-39).

The Board summarily "affirm[ed]" the ALJ's "rulings, findings, and conclusions" and "adopt[ed]" her remedial order with modifications not pertinent here. 362 NLRB No. 174, at 1 (footnotes omitted). Member Johnson joined the decision but wrote separately to note that, in an appropriate case, "he would modify the *Levitz* standard by requiring that unions present evidence of reacquired majority support within a reasonable amount of time[.]"[4] *Id.* at 1 n.2.

---

[4] Two weeks elapsed between Alan's securing the six signatures and his indirectly revealing the same to Scomas by filing the ULP charge. Member Johnson stated that "the [U]nion's failure to give notice of its restored majority status misled [Scomas] into a disruptive unlawful withdrawal with the collateral effect of precluding employees from filing a decertification election petition with the Board." 362 NLRB No. 174, at 1 n.2. In his view,

## II.  ANALYSIS

Scomas petitions for review on two grounds: (1) it did not violate the Act; and (2) even if it did, an affirmative bargaining order is too extreme a remedy.   We reject the first ground but agree with the second.

### A.  SCOMAS VIOLATED THE ACT.

Based on the revocation signatures and Lian Alan's testimony, the ALJ found that Scomas did not meet its burden of proof under *Levitz Furniture Co.*, 333 NLRB 717 (2001). The Board affirmed the ALJ's finding and Scomas does not challenge it.   Instead Scomas argues that it did not have to satisfy *Levitz* at all.   We disagree.

Scomas contends that an employer who relies with "good-faith certainty . . . on a petition signed by a majority of the employees in the bargaining unit" does not violate the Act by decertifying a union based on the petition.  Pet'r Br. 14 (emphasis omitted).    *Levitz* squarely forecloses the contention, holding that a decertification "petition signed by a majority of the employees in the bargaining unit" does not shield an employer from the "peril" of a ULP charge unless the employer shows that the union "actually" lacked majority support when the employer withdrew recognition.   333 NLRB at 725.   Our own precedent has recognized that principle, *see, e.g.*, *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 180-82 (D.C. Cir. 2006) (applying *Levitz* where employer relied on "disaffection petition . . . purportedly signed by 96 of the unit's 164 employees"), and we are not free to ignore it, *see HTH Corp. v. NLRB*, 823 F.3d 668, 676 (D.C. Cir. 2016) (panel

however, Scomas had not sufficiently raised the notice issue in its exceptions to the ALJ's decision.   *Id.*

cannot "overrule or supersede a prior panel's decision" (internal quotation omitted)).

In its briefs, Scomas alternatively urged "a modification of the *Levitz* framework" based on the Union's failure to disclose its restored majority status. Pet'r Reply Br. 6. In particular, it asked us to "impos[e] on the [u]nion an affirmative duty to notify an employer of reacquired majority support *after* withdrawal of recognition." Pet'r Br. 18 (emphasis in original). We are uncertain whether its request still stands: Scomas stated at oral argument that it is "not contesting *Levitz*." Oral Arg. Recording 3:17-3:25. In any event, we see no basis for the modification Scomas proposed. *Levitz* focuses on "the time [at which] the employer withdrew recognition," 333 NLRB at 725, and the Board has repeatedly declined to consider evidence that "was not before the [employer] when it withdrew recognition," *Highlands Hosp. Corp.*, 347 NLRB 1404, 1407 n.17 (2006), *enforced*, 508 F.3d 28 (D.C. Cir. 2007); *see also, e.g.*, *Anderson Lumber Co.*, 360 NLRB 538, 543 (2014) ("post-withdrawal . . . evidence is irrelevant"), *enforced sub nom.*, *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321 (D.C. Cir. 2015). Our cases have deferred to the Board's approach as "rational and consistent with the Act." *Pac. Coast Supply*, 801 F.3d at 333 (internal quotation omitted); *see Highlands Hosp. Corp.*, 508 F.3d at 32. We would run afoul of those cases were we to hold that liability turns on what a union tells (or fails to tell) an employer *after* the employer withdraws recognition.

## B. THE BOARD ABUSED ITS DISCRETION IN IMPOSING A BARGAINING ORDER.

The Act "charges the Board with the task of devising remedies to effectuate [its] policies." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346 (1953) (citing 29 U.S.C.

§ 160(c)). In view of the Board's expertise, *see Caterair Int'l v. NLRB*, 22 F.3d 1114, 1120 (D.C. Cir. 1994), "[w]e will disturb [its] remedy only when it amounts to an abuse of discretion," *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991). The standard of review is deferential but not toothless: we must "assure ourselves that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Caterair Int'l*, 22 F.3d at 1120 (internal quotation omitted). Here, the Board failed in every respect.

For starters, we see no indication that the Board considered why a bargaining order was necessary in *this* case, an unusual one in which the Union withheld information about its restored majority status. "[A]n affirmative bargaining order is an extreme remedy, because according to time-honored Board practice it comes accompanied by a decertification bar that prevents employees from challenging the Union's majority status for at least a reasonable period." *Caterair Int'l*, 22 F.3d at 1122 (internal quotations omitted). A decertification bar, in turn, "touch[es] at the very heart of employees' rights" by preventing them from "dislodg[ing] the union" no matter "their sentiments about it." *Id.* Because the remedy is so potent, we require the Board to "justif[y]" it

> by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' § 7 rights [of self-organization and collective bargaining]; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative

> remedies are adequate to remedy the violations of the Act.

*Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000); *see Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1461 (D.C. Cir. 1997) (per curiam) (noting that, "[b]ecause affirmative bargaining orders interfere with the employee free choice that is a core principle of the Act," we "view[] them with suspicion" and demand special justification for them (internal quotation omitted)).

Here, the ALJ—whose findings the Board summarily affirmed, 362 NLRB No. 174, at 1 (Aug. 21, 2015)—purported to satisfy the reasoned-analysis requirement by quoting wholesale, *id*. at 7, from the Board's decision in *Anderson Lumber*, 360 NLRB at 538-39. But *Anderson Lumber* is inapposite. Unlike the Union here, the union there did not withhold information about its restored majority status. For that reason alone the ALJ's cut-and-paste job does not suffice. *See Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1066 (D.C. Cir. 2001) ("extensive quotation" is no "substitute[]" for "consider[ing] the factors as they apply to the instant case"); *Lee Lumber*, 117 F.3d at 1461 ("[I]f the Board wishes to impose an affirmative bargaining order, it must explain why that remedy is appropriate given the facts of that particular case.").

We could send the case back to the Board for a better explanation. The problem, however, "is not just that the Board has failed to justify its position[.]" *Skyline Distribs. v. NLRB*, 99 F.3d 403, 404 (D.C. Cir. 1996). The problem is that its position cannot be justified. We decline to merely order a remand that would permit the Board to reimpose a bargaining order. *See id*. at 412 (vacating bargaining order and remanding for lesser remedy because no findings could justify

order); *see also Vincent Indus. Plastics*, 209 F.3d at 739 ("[R]elief delayed under the Act may be relief denied.").

"[A] bargaining order is not a snake-oil cure for whatever ails the workplace[.]" *Avecor, Inc. v. NLRB*, 931 F.2d 924, 938-39 (D.C. Cir. 1991). It therefore should be prescribed only when the employer has committed a "[h]allmark violation[]" of the Act. *Id.* at 934, 936; *see Douglas Foods Corp.*, 251 F.3d at 1065. It should not be imposed if the violation is "far from serious." *Skyline Distribs.*, 99 F.3d at 410. Severity depends on (*inter alia*) whether the employer's conduct was "deliberate or calculated," *id.* at 411 (internal quotations omitted), whether it was "the genesis of [the] employees' desire to rid themselves of" the union, *Daisy's Originals, Inc. v. NLRB*, 468 F.2d 493, 502 (5th Cir. 1972), and whether it was so "flagrant" that an election cannot fairly be held, *id.* at 503 (internal quotation omitted).

Far from being deliberate or calculated, Scomas's violation was unintentional.[5] The company acted in good faith on a facially valid decertification petition. It verified the petitioners' signatures. The same day that its general manager, Roland Gotti, received the petition, the Union's lead organizer, Lian Alan, requested bargaining for the first time in a long time. Gotti did not have to write off the timing as a coincidence. He could reasonably assume the Union knew of the petition and he could reasonably expect Alan to challenge it if the Union doubted it as a measure of employee sentiment. Yet Alan said nothing of the petition, let alone that he intended to persuade the petitioners to revoke their signatures. And

---

[5] At oral argument, the Board resisted the notion that the violation was "technical." Oral Arg. Recording 13:14-13:50, 19:20-19:45. Fair enough; call it inadvertent and "far from serious." *Skyline Distribs.*, 99 F.3d at 410.

even after six petitioners revoked their signatures at Alan's behest—restoring the Union's majority status—Alan did not tell Scomas. Three days after receiving the petition and having heard nothing from the Union, Scomas withdrew recognition. In doing so, it may have been incautious with respect to *Levitz* and insufficiently wary of Union gamesmanship. But nothing about its conduct was "flagrant." *Daisy's Originals*, 468 F.2d at 503 (internal quotation omitted).

The Board suggests "any 'gamesmanship'" was "on the part of the Company." Resp't Br. 24 n.9. We see none. Scomas did not "ignore[] the election called for by the employees" or "its own option to request an election." *Id*. Because it had no reason to doubt that 29 of 54 unit employees supported the decertification petition, it had no reason to call for an election. The petition sought an election only if the petitioners "make up 30% or more (and less than 50%) of the bargaining unit." JA 131-32. Indeed, the petition stated that, if the petitioners "make up 50% or more of the bargaining unit," Scomas was to "withdraw recognition from [the Union] *immediately*." *Id*. (emphasis added). Understandably, that is just what Scomas did.

This is not a case in which, absent a bargaining order, Scomas would "benefit by [its] own wrongs." *Daisy's Originals*, 468 F.2d at 502. As far as the record reflects, the genesis of the employees' discontent was not Scomas's conduct but an extended period of Union neglect. It follows that an election can fairly be held without a bargaining order and attendant bar on questioning the Union's majority status. Contrary to the Board's analysis, 362 NLRB No. 174, at 7, there is no "taint" to "dissipate[]." The only conceivable function of the order, then, is to punish Scomas, presumably to deter future violations. But we see no evidence that, absent

the order, Scomas will recidivate. *Cf. NLRB v. Century Moving & Storage, Inc.*, 683 F.2d 1087, 1094 (7th Cir. 1982) (reversing bargaining order where "recurring misconduct" unlikely).

In any event, in imposing a remedy, the Board must balance deterrence with "ascertainable employee free choice." *Caterair Int'l*, 22 F.3d at 1122 (internal quotation omitted). Here, the bargaining order "give[s] no credence whatsoever to employee free choice." *Skyline Distribs.*, 99 F.3d at 411 (internal quotation omitted). Even after six unit employees revoked their signatures, at least 42 per cent (23 ÷ 54) of the unit employees supported an election. The Board contends that, because Scomas "did not demonstrate that the Union actually lost the support of a majority of employees," an election would not be an appropriate "alternative remed[y]." Resp't Br. 30. That makes no sense. The threshold for an election is 30 per cent, not 50 per cent. NLRB Casehandling Manual, Pt. 2, Representation Proceedings § 11023.1 (Jan. 2017).

In sum, the bargaining order does not further the Act's policy of "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing[.]" 29 U.S.C. § 151. To the contrary, it handcuffs Scomas's employees to the Union for no good record-based reason. Accordingly, we grant the petition for review, deny the cross-petition for enforcement, vacate the bargaining order and remand to the Board for the determination of a new remedy. *See Skyline Distribs.*, 99 F.3d at 412.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: The United States Supreme Court has cautioned that the trial process is not to be treated as "a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Florida*, 399 U.S. 78, 82 (1970). The same ought to be true of labor relations. But participants on either side of the table could easily draw a different conclusion from *Levitz Furniture Co.*, 333 NLRB 717 (2001), which holds that an employer withdraws recognition from a union "at its peril" even when it acts in good faith on a facially valid decertification petition, *id.* at 725. I write separately to express my view that *Levitz* should be carefully cabined in cases involving restored majority status so that it does not reward gamesmanship at the expense of transparency.[1]

The statute itself hints at one limiting principle. Section 8(a)(5) makes it "an unfair labor practice for an employer . . . to *refuse* to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5) (emphasis added). Ordinarily, the act of "refus[al]" is volitional: it requires "a positive willingness," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1910 (1993), or a knowing "reject[ion]," XIII OXFORD ENGLISH DICTIONARY 495 (2d ed. 1989), not simply a failure. *See, e.g.*, *Overton v. City of Austin*, 748 F.2d 941, 949 (5th Cir. 1984) (court's "mere failure" to grant injunctive relief was "not the same as 'refusing' it"); *Hinson v. Mich. Mut. Liab. Co.*, 275 F.2d 537, 539 (5th Cir. 1960) (under since-amended version of Federal Rule of Civil Procedure 37, excusable

---

[1] I am not alone in this view. In the Board decision, Member Johnson suggested that *Levitz* should not be read as "a policy allowing unions to withhold evidence of reacquired majority support." 362 NLRB No. 174, at 1 n.2. Similarly, in *Johnson Controls, Inc.*, NLRB Case No. 10-CA-151843 (Feb. 16, 2016), an ALJ declined to extend *Levitz* "so far that it smiles on 'gotcha.'" ALJ Decision at 13. As far as its docket shows, the Board has not issued a final decision in *Johnson Controls*.

"failure" to comply with court order was not "refusal" to obey it).   It is linguistically jarring to say that an employer acting on a facially valid decertification petition "refuses" to bargain with a union that, unbeknownst to the employer, has covertly collected enough revocation signatures to restore majority status.

Even *Levitz* is distinguishable on that basis.   When the employer there told the union it had "objective evidence" that the union no longer enjoyed majority status, the union replied that it had evidence to the contrary and was "ready at any time" to present it.   333 NLRB at 719 (internal quotation omitted).   The employer withdrew recognition anyway, without examining the union's alleged evidence.   *Id*.   *That* is a refusal to bargain.

I read *Levitz* to hold that the employer assumes the risk of being wrong about the union's majority status, not that the employer assumes the risk of union subterfuge.   The Act must be construed in a way that fosters "industrial peace" and "stability in collective-bargaining relationships" "without impairing the free choice of employees." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 794 (1990) (internal quotation omitted).   Giving a union free rein to withhold information about restored majority status would sow tension and distrust, not peace and stability.   For fear of an unforeseeable ULP charge, a prudent employer would be hard pressed to withdraw recognition even when presented with a seemingly reliable decertification petition—and even where, as here, the petition demands "immediate[]" ouster.   JA 131-32. So much for employee free choice.

True, an employer with a good-faith doubt about a union's majority status can call for an election, *Levitz*, 333 NLRB at 723, but it is no cure-all.   A union can and often does file a

ULP charge—a "blocking charge"—"to forestall or delay the election." *Id*. at 732 (Member Hurtgen, concurring). Even when the charge is dismissed and the union loses the election, it can file objections afterward. *Id*. The process takes months. Jeffrey M. Hirsch, *NLRB Elections: Ambush or Anticlimax?*, 64 EMORY L.J. 1647, 1652-53 (2015) (summarizing Board statistics about election delays); *see id*. at 1663 (noting that recent election reforms have not addressed use of blocking charge as "tactic" for "delay"). In the meantime, the employer must continue to recognize the union despite its putative lack of majority support. *Levitz*, 333 NLRB at 732 (Member Hurtgen, concurring).

The Union's conduct in this case highlights the foregoing problems. Had the Union's lead organizer, Lian Alan, had any concern for the wishes of unit employees, he would have notified Scomas as soon as he collected the revocation signatures so that, in keeping with the decertification petition, the Board could conduct an election. After all, 23 petitioners remained. They represented 42 per cent of the unit employees. Their signatures alone would have triggered an election. NLRB Casehandling Manual, Pt. 2, Representation Proceedings § 11023.1 (Jan. 2017) (setting required threshold of "[p]etitioner interest" at 30 per cent); *see* JA 131-32 (petition called for election if petitioners "make up 30% or more (and less than 50%) of the bargaining unit"). At minimum Alan should have told Scomas about the revocation signatures when Scomas withdrew recognition so that it could take immediate corrective action. His refusal to do so reflects that he deliberately let Scomas act "at its peril," *Levitz*, 333 NLRB at 725, positioning the Union to pursue a ULP charge and delay the election.[2] It was a neat trick, really. One

---

[2] If Scomas *had* challenged the ALJ's credibility findings, this likely would have been the rare case in which I would have voted to

doubts the Union would have won an election after years of doing nothing for the employees.  And here we are another three and one-half years later with the Union still at the helm.

In short, I do not think an employer violates the Act when, in good faith, it withdraws recognition from a union as a result of the union's intentional nondisclosure of its restored majority status.  Scomas's conduct would fit that description had Scomas established that, fully informed, it would not have withdrawn recognition.[3]  But it introduced no direct evidence on that score.  *See, e.g.*, Oral Arg. Recording 1:42-2:06 (Scomas's counsel acknowledged that general manager Roland Gotti did not testify about "what he would have done if he had

---

set them aside as "patently insupportable."  *Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1061 (D.C. Cir. 2001) (internal quotation omitted).  Alan's concealment of the revocation signatures says a great deal about his forthrightness generally.  The employees who revoked their signatures testified that they did so because Alan told them, in some formulation or another, that they faced dire consequences—loss of benefits, termination or immigration consequences—if the Union were decertified.  362 NLRB No. 174, at 5.  The ALJ rejected their testimony because they could not agree on what words were uttered, *id*., but the collective gist was consistent.  If their accounts differed in minor particulars, the difference showed only that they did not script and rehearse a unified story beforehand.  It was Alan's account that could not be reconciled at any level of generality.

[3]  Because a union's loss of majority status is "an affirmative defense" to a ULP charge, "the employer has the burden of establishing" it.  *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (internal quotations omitted).  By the same logic, I would require an employer who claims union concealment to show that it would not have withdrawn recognition had it known of the union's restored majority status.

known of the six defectors"); *cf. Johnson Controls, Inc.*, NLRB Case No. 10-CA-151843, ALJ Decision at 13 (Feb. 16, 2016) (finding no violation where, *inter alia*, employer "remained open to considering evidence that contradicted the disaffection petition"). Thus, I see no way around the unsatisfying conclusion that Scomas violated the Act.